UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-20914-CIV-LENARD/GARBER

LUIS DIAZ-MARTINEZ,

      Plaintiff,

vs.

MIAMI-DADE COUNTY, a Florida Municipal
Corporation; Estate of FERNANDO W.
MENDEZ, individually; JOSEPH T. DANIELS,
individually; NORMAN SHIPES, individually;
JESSE PATMORE, individually; J.J. CROCKER,
individually; RICHARD CALVERT, individually;
ROBERT KELLER, individually; IRVING
HELLER, individually; and JOHN and JANE
DOES 1 through 10, police and supervisory
officers of the Miami-Dade County police, in their
individual capacities as officers and in their official
capacities as policymakers for Miami-Dade
County,

      Defendants.
_____/

## **OMNIBUS REPORT AND RECOMMENDATION**

     **THIS CAUSE** is before the Court upon an Order of Reference entered by the Honorable

Joan A. Lenard on February 19, 2009 **(D.E. 187).** The Order refers several motions to dismiss filed

by Defendants, Miami-Dade County **(D.E. 56),** Defendant Irving Heller ("Heller") **(D.E. 57),**

Defendant J.J. Crocker ("Crocker") **(D.E. 58),** Defendant Jesse Patmore ("Patmore") **(D.E. 59),**

Defendant Norman Snipes ("Snipes") **(D.E. 62),** Defendant Robert Keller ("Keller") **(D.E. 63, 64),**

Defendant Richard Calvert ("Calvert") **(D.E. 65),** and Defendant Joseph T. Daniels ("Daniels")

**(D.E. 151).**

     Upon review of the Motions, the Responses, the Notices of Adoption, Defendant's

Supplemental Authority, Plaintiff's Response to same,  the court file, hearing argument from counsel, and being otherwise duly advised in the premises, the undersigned makes the following findings.

## I.  Procedural History

A status conference was held before the undersigned on April 16, 2009.  At that time, the parties advised that U.S. Magistrate Judge Barry L. Garber had recently granted a Motion for Leave to File a Third Amended Complaint. (See **D.E. 189).**  Same was filed on January 22, 2009. **(D.E. 191).**  Accordingly, this Court entered a Procedural Order deeming moot the above noted motions – which were directed at the Second Amended Complaint. (See **D.E. 216).**

As noted in the Order, in response to the Third Amended Complaint, Defendants Miami-Dade County, Heller, Crocker, Patmore, Snipes, Keller, Calvert, and Daniels have filed notices adopting their prior motions to dismiss and supporting memoranda. (See **D.E. 193, 194, 195, 196, 197, 198, 199, & 200).**  Plaintiffs  have done the same as to their memoranda in opposition. (See **D.E. 202, 203, 204, 205, 206, 207, 208, & 209).**

Upon review of the Third Amended Complaint, it appears that the only changes are as to the naming of the Personal Representative of the Estate of Fernando W.  Mendez, and the correction of certain scrivener's errors. **(D.E. 178).**  In other words, there are no substantive changes.  As such, the Court takes notice of the adoption of the prior motions and memoranda and will treat them as pending motions related to the Third Amended Complaint.

## II.  Background[1]

---

[1]      On a Rule 12(b)(6) motion to dismiss, the Court must accept the plaintiff's factual allegations as true and construe them broadly and in the light most favorable to the plaintiff. See Watts v. Fla. Int'l Univ., 495 F.3d 1289, 1295 (11th Cir. 2007); Cottone v. Jenne, 326 F.3d 1352, 1355 (11th

A.    Plaintiff's wrongful conviction and exoneration

On May 9, 1980, Plaintiff was convicted in the Circuit Court of Florida, for the County of Dade, for the crimes of kidnapping, sexual battery, involuntary sexual battery, robbery, unlawful possession of firearm while engaged in a criminal offense, aggravated assault, and burglary of structure. **(D.E. 191, Third Amended Complaint ("TAC") ¶ 70)**.    Plaintiff was sentenced to three consecutive life sentences and a number of additional concurrent sentences. **(TAC ¶ 71)**. Roughly twenty-two years later, based on the recanted testimony of two victims, L.C. and D.C.[2], the State of Florida moved the Circuit Court of the Eleventh Judicial Circuit in and for Dade County, Florida, to vacate Plaintiff's convictions in two of the cases brought against him. **(TAC ¶ 72)**. On March 7, 2002, Plaintiff's convictions in the two cases were vacated by the Circuit Court. **(TAC ¶ 73)**. On August 3, 2005, on the basis of DNA evidence, Plaintiff was exonerated from all the other crimes for which he had been convicted, and the Circuit Court vacated the remainder of his convictions. **(TAC ¶ 74-75)**. Plaintiff had been held continuously in custody for nearly twenty-six years. **(TAC ¶ 76)**.

Plaintiff's vacated convictions stemmed from his alleged involvement in a series of twenty-five rapes and assaults which occurred around Bird Road in Miami-Dade County, Florida in the late 1970s. **(TAC ¶ 21)**. The attacks were all conducted in a similar manner: the assailant would drive up behind a lone woman riding in her car late at night, flash his lights at her, and then display a gun and order the female driver to get into his car; the women who entered the assailant's car were

---

Cir. 2003).

[2]    For privacy reasons, the victims are referred to by their initials throughout the pleadings and in this Order.

sexually assaulted; the assailant often took the victim's driver's license or other souvenirs. (Id.) The similar nature of the attacks led the Miami-Dade Police Department ("MDPD") - then known as the Metro-Dade Police Department - and the press to believe that one person was responsible for all of the attacks. (Id.) In the summer of 1979, this assailant came to be popularly referred to as the "Bird Road Rapist." (Id.) The MDPD attempted a series of stakeouts in the Bird Road area during the summer of 1979 but did not uncover any productive leads. **(TAC ¶ 23)**.

> B.     The MDPD investigation of Plaintiff

Plaintiff was suspected of involvement in the attacks prior to the summer of 1979. On July 19, 1977, C.J. was raped in the Bird Road area. **(TAC ¶ 24)**. Immediately after she was assaulted, C.J. described her assailant to the police as a white Cuban male, 6'2" and 200-220 lbs, with dark graying hair, brown eyes, a mustache, and acne scars. **(TAC ¶ 25)**. C.J. told the MDPD that her assailant spoke fluent English with a Spanish accent and drove a dark green two-door fastback, with a black vinyl top and a dark interior, possibly a '69-'70 Ford Fairlane. (Id.) Four days after she was attacked, C.J. saw Plaintiff drive into a gas station where she worked and was convinced that he was her assailant. **(TAC ¶ 26)**. She wrote down his license plate number and reported it to the police. (Id.)

At that time, Plaintiff was 5'4" and 140 lbs, with black hair with no gray in it, clean shaven, and without acne scars. **(TAC ¶ 27)**. He drove a green four-door 1968 Chevrolet Impala. (Id.) He worked as a short-order cook at Lila's Restaurant and had no prior criminal record. **(TAC ¶ 28)**. The MDPD investigated Plaintiff following their receipt of C.J.'s tip. The MDPD determined that Plaintiff could not speak English and a polygraph test of C.J. revealed that she was uncertain of her identification of Plaintiff as her assailant. **(TAC ¶ 29)**. Because Plaintiff did not match C.J.'s

4

description and because C.J. was uncertain of her identification, the MDPD decided not to pursue any further investigation of Plaintiff. (Id.)

Over two years later, on August 20, 1979, during the growing public discontent over the at-large Bird Road Rapist, Defendant Calvert, an MDPD Lieutenant, received a letter from C.J. asking why the MDPD had not prosecuted Plaintiff, the man she had identified as her assailant in July of 1977. **(TAC ¶ 24)**. Based on C.J.'s letter, Defendant Calvert instructed MDPD officers to reopen their investigation of Plaintiff. **(TAC ¶ 30)**. Defendant Keller, an MDPD sergeant, directed and oversaw the investigation.

C. Defendants' investigation of Plaintiff

      1. The photo identification

On August 24, 1979, Defendant Calvert and Defendant Daniels and either Defendant Shipes or Defendant Crocker[3] showed a photo array to L.C. **(TAC ¶ 33)**. L.C. had been raped in the Bird Road area on June 24, 1979. (Id.) The photo array consisted of a driver's license photo of Plaintiff, but mug shots of the other members of the photo array. (Id.) When first showed the array, L.C. said that none of the men looked like her assailant and asked to see more pictures. (Id.) The defendant officers instructed L.C. to look closer at the photo array. (Id.) L.C. said that all of the people in the photo array besides Plaintiff had large frames, while her assailant had a small frame, and she wanted to see more people with small frames. (Id.) The defendant officers instructed her for a second time to look more closely at the photo array that contained Plaintiff's driver's license photo. (Id.) After being instructed twice by the defendant officers to look more closely at the photo array containing Plaintiff's photo, L.C. still did not identify Plaintiff as her rapist. **(TAC ¶ 34)**. Instead, L.C. said

---

    [3]      Defendants Daniels, Shipes, and Crocker were MDPD detectives at the time.

that she could not definitively identify Plaintiff as her assailant but would like to see him in person.

(Id.) The defendant officers told L.C. that she needed to sign the back of Plaintiff's photo in order

for them to pick him up and bring him to her in person.  L.C. followed the defendant officers'

instructions but never identified Plaintiff.  (Id.)  After she signed the back of the photograph, the

defendant officers indicated to L.C. that she had picked out her assailant and that another victim had

already identified Plaintiff.  (Id.)

The defendant officers never told the prosecution or defense how they had conducted the

display of the photo array to L.C. **(TAC ¶ 35).**  Instead, the defendant officers falsely reported that

L.C. had made a positive identification of Plaintiff from the photo array.  (Id.)

2.      Fabricated evidence

On August 27, 1979, Defendants Shipes and Daniels went to Lila's Restaurant, where

Plaintiff worked, to ask him to come to the MDPD station to give fingerprints and have a photograph

taken. **(TAC ¶ 37).**  Defendants Shipes and Daniels communicated with Plaintiff through his co-

workers who then translated into Spanish.  (Id.)

On August 27, 1979, Plaintiff voluntarily went to the MDPD station where he gave

fingerprints and had his photograph taken. **(TAC ¶ 38).**  The next day, he returned to the MDPD

station to be interviewed. **(TAC ¶ 39).**  He was interviewed by Defendants Shipes and Daniels

through a Spanish interpreter and his civil attorney was present throughout the interview. (Id.) After

this interaction, Defendants Shipes and Daniels fabricated evidence that Plaintiff had spoken English

to them at Lila's Restaurant and during his interview. **(TAC ¶ 40).**  They also fabricated evidence

that Plaintiff's civil attorney had told them that Plaintiff spoke good English and that he had been

present during the interview when Plaintiff spoke English. **(TAC ¶ 41)**.  On August 29, 1979,

Defendants Shipes and Daniels swore out a felony complaint including this deliberately fabricated evidence.  **(TAC ¶ 42)**.

On August 28, 1979, at the direction of Defendant Keller, Defendants Mendez  and Patmore, detectives with the MDPD, went to Plaintiff's old apartment building to canvass his former neighbors.  **(TAC ¶ 44)**.  Most of the occupants of the apartment building spoke Spanish.  **(TAC ¶ 45)**.  Defendant Mendez was fluent in Spanish while Defendant Patmore did not speak Spanish. (Id.) The same day of the canvass, Defendants Mendez and Patmore told Defendant Keller and the other investigating officers that three of Plaintiff's former neighbors had told them the following information: Plaintiff spoke English; Plaintiff had a mustache in 1977 or 1978; Plaintiff had access to many different cars through his brother-in-law, a used car salesman; Plaintiff often stayed out late at night after work drinking, and often had strange visitors late at night who drove expensive cars; Plaintiff was involved with drugs or associated himself with drug dealers; and the neighbors feared Plaintiff.  **(TAC ¶ 46)**.  Each of these pieces of information was a deliberate fabrication as none of Plaintiff's neighbors told Defendants Mendez and Patmore any of this information and the information was entirely false.  **(TAC ¶ 47)**.  Defendant Mendez later created a written report memorializing the fabricated evidence that he claimed he had received from his canvass of Plaintiff's old apartment building.  **(TAC ¶ 48)**.

The prosecutor authorized the arrest of Plaintiff after receiving the evidence fabricated by Defendants Shipes, Daniels, Mendez and Patmore and the faulty identification of Plaintiff by L.C. **(TAC ¶ 49)**.  MDPD officers including Defendants Keller, Shipes, Daniels, and Mendez arrested Plaintiff in the early morning of August 29, 1979.  **(TAC ¶ 50)**.  There was absolutely no physical evidence linking Plaintiff to any of the rapes or assaults, despite exhaustive searches by the MDPD.

**(TAC ¶ 54).** There was also no evidence that Plaintiff ever had a gun or access to multiple cars. (Id.)

At the time, Plaintiff spoke little or no English and this was known to the police defendants. **(TAC ¶ 51).** Defendant Mendez later falsely reported, both orally and in writing, that, following Plaintiff's arrest, he had an extensive conversation with Plaintiff in English in which Plaintiff understood all questions asked in English and responded appropriately in English. **(TAC ¶ 52).** Defendant Keller later falsely testified at his deposition that he overheard Plaintiff speaking broken English during this interview with Mendez. **(TAC ¶ 52).** Defendant Keller also signed off on Defendant Mendez's report of his conversation with Plaintiff and verified it as accurate. (Id.)

3.     The press conference

The same day that Plaintiff was arrested, the MDPD held a press conference announcing the arrest. **(TAC ¶ 55).** Defendant Heller, the head of the Robbery and Sexual Battery Section of the MDPD, spoke at the press conference, as did Defendant Calvert   (Id.) At the time of the arrest, MDPD officers, including Defendants Heller and Calvert, knew that almost every victim of the Bird Road Rapist had never identified Plaintiff as their assailant. (Id.) They also knew that the MDPD planned on holding a lineup on August 31, 1979 to give the numerous suspected victims of the Bird Road Rapist an opportunity to identify Plaintiff. (Id.) Further, they knew that they were not supposed to release any photographs of Plaintiff in advance of the lineup to avoid tainting the lineup. (Id.)

At the press conference, which was televised, Defendant Heller announced Plaintiff's arrest and stated that, "without hesitation," Plaintiff was involved with at least two of the rapes. **(TAC ¶ 56).** Defendant Heller also gave a physical description of Plaintiff, knowing that such information

8

could improperly taint the lineup. **(TAC ¶ 57)**. Additionally, he provided Plaintiff's full name and his home and work address. (Id.) He also falsely indicated that two independent leads had led the police to Plaintiff and that, although Plaintiff denied speaking English, he would break into English during heated exchanges. (Id.) When Defendant Calvert spoke, he falsely stated that he had "long ago" compiled a profile of the Bird Road rapist and that Plaintiff perfectly matched the profile. **(TAC ¶ 58).** The press conference was covered by the local newspapers and television news. (Id.)

### 4. The lineup

On August 31, 1979, MDPD officers - including Defendants Shipes, Daniels, Mendez, and Calvert - held a physical lineup containing six people for 22 victims of the Bird Road Rapist. **(TAC ¶ 59).** Plaintiff was the only person in the lineup whose photo had been shown to any of the victims prior to the physical lineup. **(TAC ¶ 60).** He was also the oldest person in the physical lineup by seven years. (Id.)

Many of the victims were prompted to select someone from the lineup when they initially could not make an identification. **(TAC ¶ 62).** Many of the victims expressed uncertainty regarding their selections. (Id.) Only five of the 22 victims identified Plaintiff as their assailant. (Id.) C.J. identified Plaintiff as her assailant. (Id.) But L.C., whose improper photo identification of Plaintiff led to his arrest, did not identify Plaintiff as her assailant. (Id.) A number of the victims picked out other members of the lineup. (Id.) Seven victims did not identify anyone in the lineup as their assailant. (Id.)

Victims who identified Plaintiff as their assailant immediately received positive reinforcement from the police defendants that they had picked the correct person. **(TAC ¶ 63).** The police did not take statements from victims who picked a person other than Plaintiff out of the lineup

or picked no one; the police conducted no further investigation of their cases. **(TAC ¶ 64).** One such woman was told by police that she "misidentified the defendant." (Id.) Two of the victims who did not identify Plaintiff at the line-up, C.L. and L.C., were privately and repeatedly shown a videotape of the lineup by MDPD officers, including Defendant Keller, until they identified Plaintiff as their assailant.[4] **(TAC ¶ 65).**

      D.     Plaintiff's prosecution

Plaintiff was prosecuted in eight of the "Bird Road Rapist" cases: these included the four women who identified Plaintiff at the live lineup, one woman who tentatively identified him at the live lineup, the two women who had been induced to identify Plaintiff at the videotaped playback of the lineup, and one woman who had never reported the alleged assault against her until she saw Plaintiff's photograph on television during a report on the Bird Road Rapist. **(TAC ¶ 68).**

The prosecution's case against Plaintiff rested on two pieces of evidence: the identification of him by the eight victims and the evidence fabricated by various police defendants that Plaintiff spoke English. **(TAC ¶ 69).** There was no physical evidence linking him to the crime, no evidence that he had access to a gun, and no evidence explaining how he would have gotten access to the cars used by the Bird Road Rapist. (Id.) Additionally, fourteen of the victims never identified Plaintiff as their assailant despite the police theory that one person committed all of the attacks. (Id.)

      E.     Plaintiff's civil action

Plaintiff instituted the instant action on April 4, 2007. (See **D.E. 1).** In his Third Amended Complaint, Plaintiff asserts eleven claims. (See **D.E. 191).** Seven of his claims are against the police

---

[4]     All of the allegations regarding the August 31, 1979 lineup appear to be directed towards Defendants Shipes, Daniels, Mendez, and Calvert, besides the private videotape viewing of the lineup which appears to be directed solely towards Defendant Keller.

defendants: a 42 U.S.C. § 1983 claim for unduly suggestive identification procedures; a 42 U.S.C. § 1983 claim for false imprisonment and malicious prosecution in violation of the Fourth Amendment; a 42 U.S.C. § 1983 claim for fabrication of evidence in violation of the Fourteenth Amendment; a 42 U.S.C. § 1983 claim for deliberate suppression of materially favorable evidence and deliberate failure to conduct an adequate investigation in violation of the Fourteenth Amendment; a 42 U.S.C. § 1983 claim for conspiracy to deprive Plaintiff of his civil rights; and two state law claims for malicious prosecution and intentional/reckless infliction of emotional distress. Three of his claims are against the County: a 42 U.S.C. § 1983 claim for unconstitutional municipal policy, custom or practice; a 42 U.S.C. § 1983 claim for failure to train and/or supervise police officer; and a state law claim for negligent training and supervision. He also asserts a 42 U.S.C. § 1983 claim against Defendants Calvert, Keller, and Heller for supervisor liability.

## II.   Analysis

Before analyzing Defendants' specific arguments to dismiss Plaintiff's claims, the Court will review some background principles that govern the disposition of Defendants' motions.

### A.   The heightened pleading standard for § 1983 actions

Federal Rule of Civil Procedure 8 requires only a short and plain statement of the claim showing that the plaintiff is entitled to relief. See Brooks v. Blue Cross and Blue Shield of Florida, Inc., 116 F.3d 1364, 1368 (11th Cir. 1997). "However, while Fed.R.Civ.P. 8 allows a plaintiff considerable leeway in framing its complaint, this circuit, along with others, has tightened the application of Rule 8 with respect to § 1983 cases in an effort to weed out non-meritorious claims, requiring that a § 1983 plaintiff allege with some specificity the facts which make out its claim." GJR Invs. v. County of Escambia, 132 F.3d 1359, 1367 (11th Cir. 1998). This heightened pleading

11

standard applies to § 1983 claims against individuals.

"While Rule 12(b)(6) does not permit dismissal of a well-pleaded complaint simply because 'it strikes a savvy judge that actual proof of those facts is improbable,' the '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" Watts v. Fla Int'l Univ., 495 F.3d 1289, 1295 (11th Cir. 2007) (quoting Twombly at 1965). "The Court has instructed us that the rule 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of' the necessary element." Watts at 1295-96 (quoting Twombly at 1965).

B.    Qualified Immunity

The police defendants argue that qualified immunity shields them from liability for all of Plaintiff's federal law claims.  The police defendants' qualified immunity arguments will be discussed as they apply specifically to each of Plaintiff's claims below. However, first the Court will lay out the basic law governing application of qualified immunity in the Eleventh Circuit.

"Qualified immunity offers a complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). The Supreme Court has established a two-part test for evaluating a claim of qualified immunity.[5]  Traditionally, the Court

---

[5]    Before reaching this two-part test, the public official "must first prove that 'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'" Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002) (quoting Courson v. McMillian, 939 F.2d 1479, 1487 (11th Cir. 1991)). The parties do not dispute that the police defendants were acting within their discretionary authority when the alleged conduct occurred.  Accordingly, the burden is on Plaintiff to show that qualified immunity does not apply. Id.

12

would first address the "threshold question" of whether the facts presented, taken in the light most favorable to the Plaintiff, show that the police defendants' conduct violated a constitutional right. Saucier v. Katz, 533 U.S. 194, 201 (2001). If Plaintiff could successfully prove the violation of a constitutional right, the Court would then determine whether the right was "clearly established" at the time of the violation such that "a reasonable official would understand that what he is doing violates that right." Hope v. Pelzer, 536 U.S. 730, 739 (2002) (quotations omitted). In making this inquiry:

> We look to case law to see whether "the right the official is alleged to have violated [has] been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent."

Bashir v. Rockdale County, 445 F.3d 1323, 1331 (11th Cir. 2006) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).

However, the Supreme Court has recently revisited this two prong test in the case of Pearson v. Callahan, 129 S.Ct. 808 (2009), and has determined that same should no longer be mandatory in certain cases. In sum, the Court held that "the judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which two prongs of the qualified immunity analysis should be addressed first." Id. at 818.

   C. Plaintiff's claims

     1. Count I:  unconstitutionally suggestive identification procedures in violation of the Fourteenth Amendment

The police defendants argue that Count I is redundant and should be dismissed, as Plaintiff's

13

claims in Count II completely subsume his claims in Count I.   The Court rejects the police defendants' argument regarding the redundancy of Plaintiff's claims. The causes of action contained in Counts I and II are separate and distinct: they have unique elements and concern different actions by the police defendants. Further, Plaintiff is "the master of the complaint," Holmes Group, Inc. v. Vornado Air Circulation Sys., 535 U.S. 826, 831 (2002), and therefore he has the right to assert multiple and alternative theories of liability and have each considered on its own merits.[6]

The police defendants argue next that Count I fails to state a claim because, although suggestive pre-indictment identification procedures may ultimately result in evidence that is inadmissible at trial, they do not themselves violate the Constitution. In support of their argument, the police defendants cite Manson v. Brathwaite, 432 U.S. 98, 113 n.13 (1977), in which the Supreme Court stated, "Unlike a warrantless search, a suggestive preindictment identification procedure does not in itself intrude upon a constitutionally protected interest."

The police defendants' argument is off the mark.  Plaintiff does not allege a constitutional violation arising solely from the allegedly impermissibly suggestive identification procedures; instead, he alleges that "as a result of these unduly suggestive procedures, ten victims misidentified [Plaintiff] both before and at trial, in violation of his  Fourteenth Amendment right to a fair trial and not to be deprived of liberty without due process of law." **(See TAC ¶ 80).** This is a valid claim in the Eleventh Circuit. See, e.g., Cikora v. Dugger, 840 F.2d 893, 895 (11th Cir. 1988).

As they do for all of Plaintiff's claims, the police defendants also argue that they are shielded from liability for Count I by qualified immunity.

---

[6]        The police defendants make the same "redundancy" argument regarding Counts III and IV.  Those arguments are rejected for the same reasons explained above.

14

The Court will now address each of the police defendant's claims to qualified immunity in light of the facts alleged by Plaintiff.

Plaintiff alleges that Defendants Calvert and Daniels and Shipes or Crocker[7] showed L.C. a suggestive photo array in which Plaintiff's picture was different from other pictures in the array. (TAC ¶ 33). Plaintiff's photo was a driver's license photo while the photos of all the other suspects in the photo array were mug shots. (TAC ¶ 31). After L.C. could not make an identification, the police instructed her to look again at the photo array. (TAC ¶ 33). The police then induced L.C. to sign the back of the photograph to give them sufficient cause to detain Plaintiff. (TAC ¶ 34). Additionally, the Defendants told L.C. that she had picked the "correct" suspect after she signed Plaintiff's photograph. (Id.) In Simmons v. United States, 390 U.S. 377, 383 (1968), the Supreme Court held that the risk of impermissible identification is greatly heightened if the victim is shown pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized. Further, in Foster v. California, 394 U.S. 440, 442-43 (1969), the Supreme Court condemned identification procedures in which "[i]n effect, the police repeatedly said to the witness, 'This is the man.'" (Emphasis supplied.) Accordingly, it should have been clear to these Defendants that Plaintiff had a clearly established right to be free from these types of unduly suggestive identification procedures. Thus, as to these four defendants' actions regarding the suggestive photo array show to L.C., the undersigned finds that qualified immunity does not attach.

Plaintiff alleges that the physical lineup conducted by MDPD officers, including Defendants Shipes, Daniels, and Calvert, was unduly suggestive and therefore a violation of the Constitution,

---

[7]    As the Court must construe the Third Amended Complaint in the light most favorable to Plaintiff at this stage of the litigation, the Court reads this allegation as pertaining to both Shipes and Crocker.

inasmuch as Plaintiff was the only person in the lineup whose photograph had been shown to any of the victims prior to the physical lineup. **(TAC ¶ 60).** He was also the oldest person in the physical lineup by seven years. (Id.) MDPD police including Defendants Shipes, Daniels, and Calvert immediately gave positive reenforcement to victims that picked Plaintiff out of the lineup. **(TAC ¶63).** Defendant Keller privately and repeatedly showed videotape of the lineup to two victims who did not identify Plaintiff at the live line-up until they finally identified Plaintiff **(TAC ¶ 65);** Defendants Shipes, Daniels, and Calvert gave immediate positive reinforcement to victims that picked Plaintiff out of the live lineup. **(TAC ¶ 63).** In light of the pre-existing law at the time of the physical lineup, the unlawful nature of the Defendants' actions should have been apparent. See Foster, 394 U.S. at 442-43; Simmons, 390 U.S. at 383. Accordingly, as to these four Defendants' actions regarding the physical lineup, the undersigned finds that qualified immunity does not attach.

However, as to Plaintiff's claim in Count I against Heller and Calvert regarding the press conference, the Court finds that qualified immunity does attach. Plaintiff alleges that Heller and Calvert "falsely informed the press" of the length of the investigation; and that Heller disclosed Plaintiff's identity, physical description, and address, knowing there would be a line up after the fact. **(TAC ¶ 58, ¶ 57).** Plaintiff has failed to provide authority abrogating these Defendants' qualified immunity and the Court does not find that their actions, in regards to the press conference, violated any "clearly established" right of the Plaintiff. Additionally, as to Defendant Patmore, Plaintiff fails to allege any facts establishing that he engaged in any unconstitutionally suggestive identification procedures in violation of the Fourteenth Amendment.

Thus, it is hereby **RESPECTFULLY RECOMMENDED** that Plaintiff be allowed to

proceed with Count I against Defendants Calvert,[8] Shipes, Daniels, Crocker, and Keller as detailed above. It is **FURTHER RECOMMENDED** that Count I be **DISMISSED** as to Defendants Heller and Patmore.

### 2. Count II: malicious prosecution[9]

To establish a federal malicious prosecution claim under § 1983, a plaintiff must prove (1) the elements of the common law tort of malicious prosecution, and (2) a violation of the Fourth Amendment right to be free from unreasonable seizures. Wood v. Kesler, 323 F.3d 872, 881 (11th Cir. 2003). Under Florida law, a plaintiff must establish each of six elements to support a claim of malicious prosecution: (1) an original judicial proceeding against the present plaintiff was commenced or continued; (2) the present defendant was the legal cause of the original proceeding; (3) the termination of the original proceeding constituted a bona fide termination of that proceeding in favor of the present plaintiff; (4) there was an absence of probable cause for the original proceeding; (5) there was malice on the part of the present defendant; and (6) the plaintiff suffered damages as a result of the original proceeding. See Kingsland v. City of Miami, 382 F.3d 1220, 1234 (11th Cir. 2004) (citing Durkin v. Davis, 814 So. 2d 1246, 1248 (Fla. 2d DCA 2002)). "If any one of these elements is lacking, the result is fatal to the action." Burns v. GCC Beverages, Inc., 502 So. 2d 1217, 1218 (Fla. 1986). However, "'[i]t is well settled that in an action to recover damages for malicious prosecution where, as here, the evidence is in dispute, the existence or non-existence of malice and want of probable cause are questions of fact for the jury.'" Kingsland, 382 F.3d at 1235

---

[8]     That is, Count I may proceed against Calvert for his role in the physical lineup.

[9]     Although Count II of the Third Amended Complaint adduces a claim for false imprisonment and malicious prosecution, Plaintiff appears to have limited his claim in Count II to malicious prosecution.(See Response to the County's Motion, D.E. 74 at 15 n.9.)

(quoting Good Holding Co. v. Boswell, 173 F.2d 395, 399 (5th Cir. 1949)).

As to Plaintiff's claims of malicious prosecution arising from Defendants Patmore, Shipes, Daniels, and Keller's alleged fabrication of evidence (see TAC ¶¶ 37-48, 53), there is only significant dispute as to the fourth and fifth elements: whether there was probable cause and malice on the part of the defendant.   "Probable cause exists when 'the facts and circumstances within the officers' knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed . . . an offense.'" Miller v. Harget, 458 F.3d 1251, 1259 (11th Cir. 2006) (citing Rankin v. Evans, 133 F.3d 1425, 1435 (11th Cir. 1998)).   Regarding malice, "the plaintiff need not allege actual malice; legal malice is sufficient and may be inferred from, among other things, a lack of probable cause, gross negligence, or great indifference to persons, property, or the rights of others." Durkin v. Davis, 814 So. 2d at 1248.

The Court finds that, given the facts alleged by Plaintiff regarding these Defendants' alleged fabrication of evidence, it would be inappropriate to dismiss Defendants Patmore, Shipes, Daniels, and Keller at this stage of the litigation.  See Kingsland, 382 F.3d at 1235.  Additionally, for the reasons described below, infra, Section II.C.3, qualified immunity does not shield these Defendants from liability for constitutional violations stemming from the fabrication of evidence.

As to the Defendants that allegedly participated in the unduly suggestive photo identification (Calvert, Daniels, Shipes, and Crocker[10]) and the Defendants that allegedly participated in the unduly suggestive lineup (Calvert, Daniels, Shipes, and Keller), the Court finds that Plaintiff has also

---

[10]      While Plaintiff is asserting multiple instances of malicious prosecution against some of the Defendants, the Court finds that this is appropriate given the facts alleged in the Third Amended Complaint.

adequately alleged claims for malicious prosecution. These Defendants seek to avail themselves of the "fellow officer rule" to shield themselves from liability. The "fellow officer rule" allows an arresting officer to assume probable cause to arrest a suspect from information supplied by other officers. See Voorhees v. State, 699 So. 2d 602, 609 (Fla. 1997). The Court finds that application of the fellow officer rule is inappropriate at this stage of the case as there are factual questions regarding what each of the Defendants knew and what information had been supplied to them by their fellow officers when they commenced or continued the legal proceedings against Plaintiff. Similarly, there are factual questions concerning whether these Defendants acted with malice. Further, as discussed above, qualified immunity does not shield these Defendants from liability for their actions in the unduly suggestive lineups.

However, as to Defendant Heller, consistent with the Court's finding that his actions during the press conference are shielded by qualified immunity. it is **RESPECTFULLY RECOMMENDED** that Count II be **DISMISSED** as to Defendant Heller.

### 3. Count III: fabrication of evidence

It was well-established in 1979 that fabricating incriminating evidence violates constitutional rights. See Riley v. City of Montgomery, 104 F.3d 1247, 1253 (11th Cir. 1997) (citing Schneider v. Estelle, 552 F.2d 593, 595 (5th Cir.1977)). Plaintiff makes detailed allegations regarding the fabrication of evidence by Defendants Patmore,[11] Shipes, Daniels, and Keller. (See **TAC ¶¶ 37-48,**

---

[11]     Defendant Patmore argues in his Motion that Plaintiff has not alleged facts demonstrating that Defendant Patmore knowingly fabricated evidence regarding statements made by Plaintiff's neighbors because Defendant Patmore does not speak Spanish and Plaintiff's neighbors speak Spanish. However, Defendant Patmore ignores that Plaintiff alleges that Defendants Patmore and Mendez fabricated the neighbors' statements - i.e., Defendant Patmore would not have needed to speak Spanish to concoct false statements in concert with Defendant Mendez.

53). Therefore, it is **RESPECTFULLY RECOMMENDED** that Count III be allowed to proceed against these Defendants.  However, the Third  Amended Complaint is completely devoid of allegations regarding fabrication of evidence by the other police defendants.  Accordingly, it is **RESPECTFULLY RECOMMENDED** that Count III be **DISMISSED** as to the remaining police defendants.  See GJR Invs. v. County of Escambia, 132 F.3d 1359, 1367 (11th Cir. 1998) ("while Fed.R.Civ.P. 8 allows a plaintiff considerable leeway in framing its complaint, this circuit, along with others, has tightened the application of Rule 8 with respect to § 1983 cases in an effort to weed out nonmeritorious claims, requiring that a § 1983 plaintiff allege with some specificity the facts which make out its claim.").

    4.    Count IV: deliberate failure to disclose material exculpatory and impeachment evidence and deliberate failure to conduct an adequate investigation in violation of the Fourteenth Amendment's guarantee of Due Process Rights

The Supreme Court has made clear that an accused's due process rights are violated when the prosecution fails to disclose material exculpatory or impeachment evidence to the defense, regardless of whether the prosecutor himself acted in bad faith or even knew of the evidence.  Giglio v. United States, 405 U.S. 150, 153-54 (1972); Brady v. Maryland, 373 U.S. 83, 87 (1963); McMillian v. Johnson, 88 F.3d 1554, 1568 (11th Cir. 1996). Further, at the time of the allegedly unconstitutional investigation and trial, its was clearly established under binding Eleventh Circuit law that an accused's due process rights are violated when the police conceal material exculpatory or impeachment evidence.  See Freeman v. State of Georgia, 599 F.2d 65, 69 (5th Cir., Jul. 18, 1979)[12] ("The police are also part of the prosecution, and the taint on the trial is no less if they, rather

---

[12]    Decisions of the former Fifth Circuit rendered prior to October 1, 1981 are binding on this court. Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

than the State's Attorney, were guilty of the nondisclosure . . . The duty to disclosure [sic] is that of the state, which ordinarily acts through the prosecuting attorney; but if he too is the victim of police suppression of the material information, the state's failure is not on that account excused."). The proper standard at the time for gauging the materiality of evidence that the defense had not specifically requested was "that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed." United States v. Agurs, 427 U.S. 97, 112 (1976); White v. Maggio, 556 F.2d 1352, 1357 (5th Cir. 1977).

Plaintiff alleges that Defendants Calvert and  Daniels  and Shipes or Crocker failed to disclose to the prosecutor the suggestive means they used to induce L.C. to make an identification of  Plaintiff and to sign the back of his photograph.  **(TAC ¶ 35).**  The Court finds that this was material evidence that could have been used to question the reliability of the MDPD's investigation of Plaintiff and the validity of the subsequent identifications.[13] Additionally, it seems axiomatic that Defendants Shipes, Daniels, Patmore, and Keller's failure to disclose that they fabricated evidence would also be a Brady violation.  As such, it is **RESPECTFULLY  RECOMMENDED** that Plaintiff's claim in Count IV be allowed to  proceed against these police defendants for their alleged actions in fabricating evidence.  However, as Plaintiff has not alleged specific facts demonstrating that Defendant Heller withheld exculpatory evidence, it is **RESPECTFULLY RECOMMENDED** that Plaintiff's claim as to Defendant Heller be  **DISMISSED**.

        5.     Count V: § 1983 Conspiracy

---

[13]    Plaintiff does not allege that Defendants Calvert, Daniels, Shipes, and Keller failed to disclose exculpatory evidence to the prosecutor regarding the physical lineup.  Accordingly, the Court does not address Count IV in relation to the physical lineup.

A plaintiff claiming a conspiracy under § 1983 must make particularized allegations that a conspiracy exists. GJR Investments, Inc. v. County of Escambia, 132 F.3d 1359, 1370 (11th Cir. 1998). Vague and conclusory allegations suggesting a § 1983 conspiracy are insufficient to withstand a motion to dismiss. Fullman v. Graddick, 739 F.2d 553, 556-57 (11th Cir. 1984); see also Dukes v. Miami-Dade County, 232 Fed. Appx. 907 (11th Cir. 2007) (supporting the claim that "'vague' and 'conclusory' allegations are insufficient to state a violation of a protected right that is necessary to deny the Defendants' qualified immunity"). "The plaintiff does not have to produce a smoking gun to establish the understanding or willful participation required to show a conspiracy, but must show some evidence of agreement between the defendants." Albra v. City of Fort Lauderdale, 232 Fed. Appx. 885, 890-91 (11th Cir. 2007) (quoting Rowe v. City of Fort Lauderdale, 279 F.3d 1271, 1283-84 (11th Cir. 2002)). A claim for conspiracy may justifiably be dismissed because of the conclusory, vague and general nature of the allegations of conspiracy. Fullman v. Graddick, 739 F.2d 553, 557 (11th Cir. 1984).

Plaintiff's conspiracy claim, Count V, fails to satisfy the heightened pleading standard for § 1983 claims. Baldly and conclusorily alleging that the police defendants "agreed among themselves and with other individuals to act in concert in order to deprive [Plaintiff] of his clearly established Fourth and Fourteenth Amendment rights" is simply insufficient to satisfy Plaintiff's burden. (See TAC ¶ 110). As the police defendants correctly note, "Plaintiff does not include any specific allegations stating when the conspiracy [sic] entered into, how the conspiracy was entered into, or the terms of the alleged agreement." (See, e.g., D.E. 59 at 9).

Upon questioning by the court, Plaintiff's counsel cited Bell Atl.Corp. v. Twombly, 127 S.Ct. 1955, 1965 (2007) in support of the proposition that an inference of conspiracy can be created.

However, Twombly is not helpful here. In that case, consumers brought a class action alleging an antitrust conspiracy against incumbent local exchange carriers, in violation of the Sherman Act. Plaintiffs, in that case, claimed that defendants "... *agreed* not to compete with one another"(emphasis added), and yet the court found that though such "statements may speak directly of agreement, on fair reading, they are merely legal conclusions...", and therefore not sufficient to state a claim of conspiracy. Id. at 564.

In sum, Plaintiff has failed to cite, either in his pleadings or at oral argument, any applicable authority in support of his present claim. Accordingly, while the alleged conduct at issue is obviously repugnant, the undersigned must **RESPECTFULLY RECOMMEND** that Count V be **DISMISSED** as to all defendants.

6.     Count VI: § 1983 supervisor liability

"Supervisor liability [under § 1983] occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation." Brown v. Crawford, 906 F.2d 667, 671 (11th Cir.1990).   A causal connection can be established in three ways: "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so," id.; "when the supervisor's improper custom or policy . . . resulted in deliberate indifference to constitutional rights," Rivas v. Freeman, 940 F.2d 1491, 1495 (11th Cir. 1991); or "by facts which support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so," Gonzalez v. Reno, 325 F.3d 1228, 1235 (11th Cir. 2003).

Defendants submitted the recently decided Ashcroft v. Iqbal, No. 07-1015, 556 U.S. –, WL

23

1351536 (May 18, 2009) case for the proposition that same "eliminates supervisory liability claims-those claims that seek to attach personal liability based on an individual's supervisory status- and holds that supervisory officials cannot be sued merely for having knowledge that a subordinate officer is acting in an unconstitutional manner." **(D.E. 222)**.   Upon careful review, the Court finds that the Iqbal decision does not support Defendant's argument herein, and does not bar the claim at hand.   As such, a lengthy analysis of same is not necessary.[14]

Here, Plaintiff has not pled facts that would support a finding of a causal connection between the actions of the supervisory defendants (Calvert, Keller, and Heller) and the alleged constitutional deprivation: that is, Plaintiff has not specifically alleged a history of widespread abuse, a supervisor defendant's improper custom or policy, or facts supporting an inference that one of the supervisor defendants directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so. See GJR Invs., 132 F.3d 1359, 1367 (11th Cir. 1998) (a § 1983 Plaintiff must "allege with some specificity the facts which make out its claim"). Accordingly, in order to sufficiently plead supervisor liability, Plaintiff must allege specific facts establishing that the supervisor defendants personally participated in the alleged constitutional violations. See Brown v. Crawford, 906 F.2d 667, 671 (11th Cir.1990).

As to Defendant Calvert, Plaintiff has adequately alleged facts that Defendant Calvert

---

[14] The Iqbal case is distinguishable from the present case in that it dealt with high cabinet level officials having a passive role in response to a national emergency. Further, the constitutional violation at issue in the Iqbal case had a "purpose" element, thus requiring "more than intent as volition or intent as awareness of consequences". Id. at *11.  It is in that context that the court held that "purpose rather than knowledge is required to impose Bivens liability". Id. at *12.  The court there recognized that "the factors necessary to establish a Bivens violation will vary with the constitutional provision at issue."  No such "purpose" element exists here.   At its broadest, Iqbal holds that there can be no supervisory liability when the defendants do not or have not had an active role in the violation. That is not the case here.

24

personally participated in the unconstitutional unduly suggestive photo array shown to L.C., as well as the unconstitutional unduly suggestive physical lineup. (See supra, Section II.C.1.)  As such, it is **RESPECTFULLY RECOMMENDED** that Plaintiff's claim for supervisor liability against Defendant Calvert for these actions be allowed to proceed.  However, Plaintiff has not alleged facts establishing that Defendant Calvert personally participated in any other constitutional violations. Accordingly, it is **RESPECTFULLY RECOMMENDED** that his claim for supervisor liability against Defendant Calvert may only proceed as to the allegedly unduly suggestive identification procedures.

As to Defendant Keller, Plaintiff has adequately alleged facts that Defendant Keller personally participated in the unconstitutional unduly suggestive video playback of the physical lineup.  (See supra, Section II.C.1).  Additionally, Plaintiff has alleged facts that Defendant Keller personally participated in Defendants Patmore and Mendez's fabrications by signing off on Defendant Mendez's fabricated report concerning Plaintiff's ability to speak English.  Further, Plaintiff has alleged facts that Defendant Keller personally participated in Defendant Mendez's fabrications by falsely testifying that he heard Plaintiff speaking broken English during Defendant Mendez's interview of Plaintiff.  Accordingly, it is **RESPECTFULLY RECOMMENDED** that Plaintiff's claim for supervisor liability against Defendant Keller for these actions be allowed to proceed.  Plaintiff also makes a claim for supervisor liability against Defendant Keller for his actions during the press conference.  Defendant Keller is protected by qualified immunity from any claims arising from this alleged conduct.  (See supra, Section II.C.1).  As such, Plaintiff's claim for supervisory liability arising from this conduct fails.

As to Defendant Heller, Plaintiff alleges that Heller should be liable for all constitutional

25

violations arising from the press conference. While Plaintiff alleges that Heller took direct actions by holding a press conference where he identified the Plaintiff, and detailed his physical description and work and home addresses, knowing that there would be a lineup after the fact, such allegations are insufficient to plead supervisor liability because making statements to the media about a public matter is not a constitutional violation.[15] (See TAC ¶ 57). Plaintiff has not identified any binding precedent that holds that making statements to the press about an arrest or investigation- even if incorrect- is a constitutional violation. (D.E. 64). Therefore, since the only allegations of direct participation on the part of Heller were not constitutional violations and, as stated above, there was no causal connection between his acts and the constitutional deprivation, Defendant Heller is protected by qualified immunity for these actions.   Accordingly, it   is **RESPECTFULLY RECOMMENDED** that Plaintiff's claim against Defendant Heller for supervisory liability be **DISMISSED.**[16]

       7.    Count VII: unconstitutional municipal policy, custom, or practice in violation of § 1983

The County contends that the County Charter in place during all times relevant to Plaintiff's action solely vested final policymaking authority in the Board of County Commissioners and the County Manager.   Accordingly, the County argues that, because the Third Amended Complaint incorrectly alleges that the final policymaking authority for the County rests in the Police Chief and the Mayor, and fails to allege that the Board of County Commissioners or the County Manager

---

[15]See e.g. Knight v. Starr, 275 So.2d 37 (Fla. App. 1973) (holding that alleged "willful" and "false" statements by defendant-sheriff in an interview "concerning appellant's arrest and imprisonment" were "absolutely privileged").

[16]Again, the Court by no means condones the alleged conduct by the Defendant.

26

adopted an unconstitutional policy, custom, or practice, Count VII must be dismissed.

Plaintiff alleges in his Third Amended Complaint that at all times relevant to this action, "the final policymakers for the MDPD included, without limitation, the Police Chief and the Mayor of the County." **(TAC ¶ 20).** Plaintiff's allegation appears to incompletely identify the final policymakers for the County. As demonstrated by the County in its Motion, the County's Charter, as it existed in 1979, stated that: the "Board of County Commissioners shall be the legislative and the governing body of the county and shall have the power to carry on a central metropolitan government" (Miami-Dade County Home Rule Charter § 1.01(A)); the County Manager "shall be the chief executive officer and head of the administrative branch of the county government" (id. § 3.01); and the Manager's responsibilities included "the administration of all units of the county government under his jurisdiction, and for carrying out policies adopted by the Commission" (id. § 3.04(A)). Accordingly, it is **RESPECTFULLY RECOMMENDED** that Count VII be **DISMISSED** *without prejudice*.

8.   Count VIII: failure to train/supervise police officers in violation of § 1983

The County presents two grounds for dismissing Count VIII. First, the County argues that Count VIII fails to state a claim. The County argues that Plaintiff has failed to allege facts sufficient to satisfy his burden of demonstrating "deliberate indifference" by the County; specifically, that "Plaintiff has failed to allege that the County knew of a need to better train its police officers" or "that the County consciously chose not to provide better training to its officers." **(D.E. 56-1 at 10).** Second, the County argues that Plaintiff's claim also fails because Plaintiff has not demonstrated that the County's alleged failure to train its police officers led to the alleged constitutional violations.

27

The County contends that because it would be obvious to untrained and unsupervised police officers that innocent men should not be framed for crimes they did not commit, Plaintiff's claim fails.

A municipality is not automatically liable under § 1983 even if it inadequately trained or supervised its police officers and those officers violated the plaintiff's constitutional rights. Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998). Instead, a municipality is liable only under "limited circumstances": where the municipality inadequately trains or supervises its employees, the failure to train or supervise is a municipal policy, and that municipal policy causes the employees to violate a citizen's constitutional rights. See City of Canton v. Harris, 489 U.S. 387, 388-89 (1989). A party may establish that such a policy exists by proving either "(1) an officially promulgated county policy or (2) an unofficial custom or practice of the county shown through repeated acts of a final policymaker for the county." Grech v. Clayton County, 335 F.3d 1326, 1329 (11th Cir. 2003). A plaintiff may prove the existence of an unofficial custom or practice by showing that the municipality's failure to train evidenced a "deliberate indifference" to the rights of its inhabitants. See Gold, 151 F.3d at 1350. "To establish a 'deliberate or conscious choice' or such 'deliberate indifference,' a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." Id.; See also Cagle v. Sutherland, 334 F.3d 980, 987 (11th Cir. 2003) ("To establish a defendant's deliberate indifference, the plaintiff has to show that the defendant had (1) subjective knowledge of a risk of serious harm; [and] (2) disregarded . . . that risk; (3) by conduct that is more than mere negligence." (Internal citations and quotations omitted)).[17] The practice must be "so

---

[17]    The Eleventh Circuit notes that this high standard of proof is "intentionally onerous" to avoid subjecting municipalities to respondeat superior liability in § 1983 actions. Gold, 151 F.3d at 1351, n.10.

pervasive as to be the functional equivalent of a formal policy." <u>Grech</u>, 335 F.3d at 1330 n.6.

Notably, "random acts or isolated incidents are insufficient to establish a custom or policy." <u>Depew</u>

<u>v. St. Mary's</u>, 787 F.2d 1496, 1499 (11th Cir. 1986).

Plaintiff does not allege that the County promulgated an official policy to avoid training and

supervising its police officers. Instead, Plaintiff alleges that the County "was deliberately indifferent

to the obvious risks that officers, left to their own devices, would induce victims to misidentify

suspects, withhold favorable evidence, fabricate evidence, and cause the conviction of innocent

people for crimes they did not commit in violation of constitutional rights." **(TAC ¶ 128).**

The Court finds that Plaintiff has failed to make allegations sufficient to state a cause of

action against the County for failure to train and/or supervise its officers under § 1983. Plaintiff

simply echoes the language of Eleventh Circuit cases by alleging "deliberate indifference"by the

County to the harm suffered by Plaintiff. <u>See</u> <u>Twombly</u> at 1965 ("a formulaic recitation of the

elements of a cause of action will not do."). Further, Plaintiff has failed to allege facts sufficient to

raise a reasonable expectation that discovery will reveal evidence that the final policymakers for the

County consciously and deliberately chose to ignore repeated acts of the type complained of by

Plaintiff. <u>See</u> <u>Grech</u>, 335 F.3d at 1329. At best, and read in the light most favorable to Plaintiff, the

Third Amended Complaint alleges that the County chose to ignore unconstitutional conduct by its

police officers in <u>this instance</u>. This is insufficient to state a § 1983 claim for failure to train. <u>See</u>

<u>Grech</u>, 335 F.3d at 1330 n.6 ("A single incident would not be so pervasive as to be a custom or

practice."); <u>See also</u> <u>Depew</u>, 787 F.2d at 1499 ("random acts or isolated incidents are insufficient

to establish a custom or policy.") Accordingly, it is **RESPECTFULLY RECOMMENDED** that

Count VIII be **DISMISSED** *without prejudice*. [18]

> 9.    Count IX: negligent training and supervision of police officers in violation of Florida law

The County argues that sovereign immunity bars Count IX. Specifically, the County argues that because Plaintiff is suing the County for "discretionary" acts, his claim is barred.

Under Florida law, "a governmental agency is immune from tort liability based upon actions that involve its 'discretionary' functions." Lewis v. City of St. Petersburg, 260 F.3d 1260, 1266 (11th Cir. 2001) (citing Dep't of Health & Rehabilitative Servs. v. Yamuni, 529 So. 2d 258, 260 (Fla. 1988)). That is, "basic judgmental or discretionary governmental functions are immune from legal action, whereas operational acts are not protected by sovereign immunity." Pollock v. Fla. Dep't of Highway Patrol, 882 So. 2d 928, 933 (Fla. 2004) (citation omitted). An act is "discretionary" when all of the following conditions have been met: (1) the action involves a basic governmental policy, program, or objective; (2) the action is essential to the realization or accomplishment of that policy, program, or objective; (3) the action requires the exercise of basic policy evaluations, judgments, and expertise on the part of the governmental agency involved; and (4) the governmental agency involved possesses the requisite constitutional, statutory, or lawful authority and duty to do or make the challenged act, omission, or decision. Trianon Park Condominium Ass'n, Inc. v. City of Hialeah, 468 So. 2d 912, 918 (Fla. 1985) (internal quotations omitted). "An 'operational' function, on the other hand, is one not necessary to or inherent in policy or planning, that merely reflects a secondary decision as to how those policies or plans will be implemented." Henderson v. Bowden, 737 So. 2d 532, 538 (Fla. 1999) (citation and internal quotation marks omitted).

---

[18]    The Court need not reach the County's "causation" argument at this time.

A municipality's decision regarding how to train its officers and what subject matter to include in the training is clearly an exercise of governmental discretion concerning fundamental questions of policy and planning. <u>Lewis v. City of St. Petersburg</u>, 260 F.3d 1260, 1266 (11th Cir. 2001). As such, to the extent that Plaintiff's Count IX alleges negligent training, his claim is barred by sovereign immunity. Plaintiff argues in his Response to the County's Motion that he is not only challenging the content of the County's training but also the way it was implemented. **(D.E. 73 at 18).** However, Plaintiff has failed to allege a single fact supporting his claim that the County negligently implemented its training program. Accordingly, it is **RESPECTFULLY RECOMMENDED** that Count VIII be **DISMISSED** *without prejudice*.

> 10.  Count X: state law malicious prosecution; Count XI: intentional infliction of emotional distress

For the reasons discussed in Section III.C.2, <u>supra</u>, the undersigned finds that Plaintiff has sufficiently alleged a claim for malicious prosecution as to Defendants Patmore, Shipes, Daniels, Crocker, Calvert, and Keller. However, as to Defendant Heller, consistent with the Court's finding that his actions are entitled to qualified immunity, it is **RESPECTFULLY RECOMMENDED** that Count X be **DISMISSED** as to him.

To establish a cause of action for the intentional infliction of emotional distress, four elements must be proven: (1) deliberate or reckless infliction of mental suffering; (2) outrageous conduct; (3) the conduct must have caused the emotional distress; and (4) the distress must be severe. <u>Dependable Life Ins. Co. v. Harris</u>, 510 So. 2d 985, 986 (Fla. 5th DCA 1987). Conduct is considered outrageous when it is found "to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the

recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" Smith v. Telophase Nat'l Cremation Soc., 471 So. 2d 163, 166 (Fla. 2d DCA 1985) (quoting Restatement (Second) of Torts § 46 at 73 (1965)).

The police defendants argue that Plaintiff has failed to allege facts demonstrating outrageous conduct necessary to establish a cause of action for intentional infliction of emotional distress. The Court finds that Plaintiff has alleged a claim for intentional infliction of emotional distress as to Defendants Shipes, Daniels, Patmore, and Keller for their alleged fabrication of evidence. Plaintiff alleges that these Defendants fabricated evidence to help obtain his conviction for rapes and assaults that he did not commit. This conduct is so extreme and intolerable as to be deemed "outrageous." However, the Court finds that, although Plaintiff has alleged serious and troublesome claims as to the remaining Defendants for some of their alleged actions, none of these Defendants' actions rise to the level of outrageousness necessary to support a claim for intentional infliction of emotional distress. Accordingly, it is **RESPECTFULLY RECOMMENDED** that Count XI be **DISMISSED** as to Defendants Crocker, Calvert, and Heller.

The police defendants argue that Plaintiff's claims under Counts X and XI must be dismissed under Florida law, which provides that police officers are immune from suit except for in limited circumstances where the officer acts outside the scope of employment or in an extreme manner demonstrating bad faith, malicious purpose, or willful and wanton disregard of human rights, safety, or property. See Fla. Stat. § 768.28(9)(a).[19] This defense is unavailable to Defendants Patmore,

---

[19]

Florida Statute § 768.28(9)(a) reads in relevant part: "No officer, employee, or agent of the state or of any of its subdivisions shall be held personally liable in tort or named as a party defendant in any action for any injury or damage suffered as a result of any act, event, or omission of action in the scope of her or his employment or function, unless such officer, employee, or agent acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property."

Shipes, Daniels, Crocker, Calvert, and Keller, as Plaintiff has alleged facts sufficient to demonstrate the existence of these Defendants' malicious purpose.

Accordingly, it is hereby **RESPECTFULLY RECOMMENDED** that

1.   Defendant Shipes's Motion to Dismiss **(D.E. 197)**,   Defendant Patmore's Motion to Dismiss **(D.E. 196)**, Defendant Crocker's Motion to Dismiss **(D.E. 195)**,   Defendant Calvert's Motion to Dismiss **(D.E. 199)**,   Defendant Keller's   Motion to Dismiss **(D.E. 198)** and Defendant Daniels's Second Motion to Dismiss **(D.E. 200)** be **GRANTED-IN-PART AND DENIED-IN - PART** consistent with this Report and Recommendation.

2.   Defendant Heller's Motion to Dismiss **(D.E. 194)** and Defendant Miami-Dade County's Motion to Dismiss **(D.E. 193)** be **GRANTED** consistent with this Report and Recommendation.

Pursuant to Local Magistrate Rule 4 (b), the parties have ten (10) days from service of this Report and Recommendation to serve and file written objections, if any, with the Honorable Joan A. Lenard, United States District Court Judge.  Failure to file timely objections shall bar the parties from attacking on appeal the factual findings contained herein. Loconte v. Dugger, 847 F. 2d 745 (11th Cir. 1998); cert. denied, 488 U.S. 958 (1988); RTC v. Hallmark Builders, Inc., 996 F. 2d 1144, 1149 (11th Cir. 1993).

**RESPECTFULLY RECOMMENDED** in Chambers at Miami, Florida this  8th  day of June 2009.

**WILLIAM C. TURNOFF**
**UNITED STATES MAGISTRATE JUDGE**

cc:    Hon. Joan A. Lenard
       Counsel of Record