UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-20914-CIV-LENARD/GARBER

LUIS DIAZ-MARTINEZ,

      Plaintiff,

vs.

MIAMI-DADE COUNTY, a Florida
Municipal Corporation; Estate of
FERNANDO W. MENDEZ, individually;
JOSEPH T. DANIELS, individually;
NORMAN SHIPES, individually; JESSE
PATMORE, individually; J.J. CROCKER,
individually; RICHARD CALVERT,
individually; ROBERT KELLER,
individually; IRVING HELLER,
individually; and JOHN and JANE DOES 1
through 10, police and supervisory officers
of the Miami-Dade County police, in their
individual capacities as officers and in their
official capacities as policymakers for
Miami-Dade County,

      Defendants.
_____/

**OMNIBUS ORDER ADOPTING IN PART REPORT AND RECOMMENDATION
(D.E. 225); GRANTING IN PART AND DENYING IN PART DEFENDANT
DANIELS'S SECOND MOTION TO DISMISS (D.E. 200), DEFENDANT
SHIPES'S MOTION TO DISMISS (D.E. 197), DEFENDANT PATMORE'S
MOTION TO DISMISS (D.E. 196), DEFENDANT CROCKER'S MOTION TO
DISMISS (D.E. 195), DEFENDANT CALVERT'S MOTION TO DISMISS (D.E.
199), DEFENDANT KELLER'S MOTION TO DISMISS (D.E. 198); GRANTING
DEFENDANT MIAMI-DADE COUNTY'S MOTION TO DISMISS (D.E. 193) AND
DEFENDANT HELLER'S MOTION TO DISMISS (D.E. 194)**

**THIS CAUSE** is before the Court on the Report and Recommendation of Magistrate

Judge William C. Turnoff ("Report," D.E. 225), issued on June 9, 2009.  In his Report, Magistrate Judge Turnoff recommends that the Court grant in part and deny in part Defendant Daniels's Second Motion to Dismiss (D.E. 200) filed on March 24, 2008, and the Motions to Dismiss of Defendants Shipes (D.E. 197), Patmore (D.E. 196), Crocker (D.E. 195), Calvert (D.E. 199), and Keller (D.E. 198), all filed on September 6, 2007.  He further recommends that the Court grant the Motions to Dismiss of Defendants Heller[1] (D.E. 194) and Miami-Dade County (the "County") (D.E. 193), also filed on September 6, 2007.[2] Having reviewed the Report, the Motions, the related papers, and the record, the Court finds as follows.

---

[1]     Throughout this Order, Defendants Daniels, Shipes, Patmore, Crocker, Calvert, Keller, and Heller will collectively be referred to as the "police defendants."

[2]     A status conference was held before Magistrate Judge Turnoff on April 16, 2009. At that time, the parties advised that Magistrate Judge Barry L. Garber had recently granted a Motion for Leave to File a Third Amended Complaint. (See  D.E. 189).  Same was filed on January 22, 2009.  (D.E. 191).  Accordingly, Magistrate Judge Turnoff entered a Procedural Order deeming moot the motions to dismiss which were directed at the Second Amended Complaint. (See D.E. 216.)

As noted in that Procedural Order, in response to the Third Amended Complaint, Defendants Miami-Dade County, Heller, Crocker, Patmore, Snipes, Keller, Calvert, and Daniels have filed notices adopting their prior motions to dismiss and supporting memoranda.  (See D.E. 193, 194, 195, 196, 197, 198, 199, 200.)  Plaintiffs  have done the same as to their memoranda in opposition. (See D.E. 202, 203, 204, 205, 206, 207, 208, 209.)

Upon review of the Third Amended Complaint, Magistrate Judge Turnoff found that the only changes to the various motions was the naming of the Personal Representative of the Estate of Fernando W.  Mendez, and the correction of certain scrivener's errors. (D.E. 178.)  In other words, Magistrate Judge Turnoff found no substantive changes.  As such, the Court takes notice of the adoption of the prior motions and memoranda and will treat them as pending motions related to the Third Amended Complaint.

## I.      Procedural History and Factual Background

The following factual background of the instant matter comes from the Report and is repeated below for the sake of clarity and completeness.   The Report took the factual allegations from the Third Amended Complaint, which, on a Rule 12(b)(6) motion to dismiss, the Court must accept as true. See Watts v. Fla. Int'l Univ., 495 F.3d 1289, 1295 (11th Cir. 2007).

### A.      Plaintiff's wrongful conviction and exoneration

On May 9, 1980, Plaintiff was convicted in the Circuit Court of Florida, for the County of Dade, for the crimes of kidnapping, sexual battery, involuntary sexual battery, robbery, unlawful possession of firearm while engaged in a criminal offense, aggravated assault, and burglary of structure.  (D.E. 191, Third  Amended Complaint ("TAC") ¶ 70.) Plaintiff was sentenced to three consecutive life sentences and a number of additional concurrent sentences.  (TAC ¶ 71.)  Roughly twenty-two years later, based on the recanted testimony of two victims, L.C. and D.C.,[3] the State of Florida moved the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, to vacate Plaintiff's convictions in two of the cases brought against him.  (TAC ¶ 72.)  On March 7, 2002, Plaintiff's convictions in the two cases were vacated by the Circuit Court.  (TAC ¶ 73.)  On August 3, 2005, on the basis of DNA evidence, Plaintiff was exonerated from all the other crimes for which he had been convicted, and the Circuit Court vacated the remainder of his

---

[3]      For privacy reasons, the victims are referred to by their initials throughout the pleadings and in this Order.

convictions. (TAC ¶ 74-75.)  Plaintiff had been held continuously in custody for nearly twenty-six years.  (TAC ¶ 76.)

Plaintiff's vacated convictions stemmed from his alleged involvement in a series of twenty-five rapes and assaults which occurred around Bird Road in Miami-Dade County, Florida in the late 1970s.  (TAC ¶ 21.)  The attacks were all conducted in a similar manner: the assailant would drive up behind a lone woman riding in her car late at night, flash his lights at her, and then display a gun and order the female driver to get into his car; the women who entered the assailant's car were sexually assaulted; and the assailant often took the victim's driver's license or other souvenirs.  (Id.)  The similar nature of the attacks led the Miami-Dade Police Department ("MDPD") - then known as the Metro-Dade Police Department - and the press to believe that one person was responsible for all of the attacks. (Id.)  In the summer of 1979, this assailant came to be popularly referred to as the "Bird Road Rapist." (Id.) The MDPD attempted a series of stakeouts in the Bird Road area during the summer of 1979 but did not uncover any productive leads.  (TAC ¶ 23.)

### B.    The MDPD investigation of Plaintiff

Plaintiff was suspected of involvement in the attacks prior to the summer of 1979. On July 19, 1977, C.J. was raped in the Bird Road area.  (TAC ¶ 24.)  Immediately after she was assaulted, C.J. described her assailant to the police as a white Cuban male, 6'2" and 200-220 lbs, with dark graying hair, brown eyes, a mustache, and acne scars. (TAC ¶ 25.)  C.J. told the MDPD that her assailant spoke fluent English with a Spanish accent and drove a dark

green two-door fastback, with a black vinyl top and a dark interior, possibly a '69-'70 Ford Fairlane. (Id.) Four days after she was attacked, C.J. saw Plaintiff drive into a gas station where she worked and was convinced that he was her assailant. (TAC ¶ 26.) She wrote down his license plate number and reported it to the police. (Id.)

At that time, Plaintiff was 5'4" and 140 lbs, with black hair with no gray in it, clean shaven, and without acne scars. (TAC ¶ 27.) He drove a green four-door 1968 Chevrolet Impala. (Id.) He worked as a short-order cook at Lila's Restaurant and had no prior criminal record. (TAC ¶ 28.) The MDPD investigated Plaintiff following their receipt of C.J.'s tip. The MDPD determined that Plaintiff could not speak English and a polygraph test of C.J. revealed that she was uncertain of her identification of Plaintiff as her assailant. (TAC ¶ 29.) Because Plaintiff did not match C.J.'s description and because C.J. was uncertain of her identification, the MDPD decided not to pursue any further investigation of Plaintiff. (Id.)

Over two years later, on August 20, 1979, during the growing public discontent over the at-large Bird Road Rapist, Defendant Calvert, an MDPD Lieutenant, received a letter from C.J. asking why the MDPD had not prosecuted Plaintiff, the man she had identified as her assailant in July of 1977. (TAC ¶ 24.) Based on C.J.'s letter, Defendant Calvert instructed MDPD officers to reopen their investigation of Plaintiff. (TAC ¶ 30.) Defendant Keller, an MDPD sergeant, directed and oversaw the investigation.

### C.    Defendants' investigation of Plaintiff

#### 1.    The photo identification

On August 24, 1979, Defendant Calvert and Defendant Daniels and either Defendant Shipes or Defendant Crocker[4] showed a photo array to L.C. (TAC ¶ 33.)   L.C. had been raped in the Bird Road area on June 24, 1979. (Id.)  The photo array consisted of a driver's license photo of Plaintiff, but mug shots of the other members of the photo array. (Id.) When first showed the array, L.C. said that none of the men looked like her assailant and asked to see more pictures. (Id.)  The defendant officers instructed L.C. to look closer at the photo array. (Id.)  L.C. said that all of the people in the photo array besides Plaintiff had large frames, while her assailant had a small frame, and she wanted to see more people with small frames. (Id.)  The defendant officers instructed her for a second time to look more closely at the photo array that contained Plaintiff's driver's license photo. (Id.)  After being instructed twice by the defendant officers to look more closely at the photo array containing Plaintiff's photo, L.C. still did not identify Plaintiff as her rapist. (TAC ¶ 34.)   Instead, L.C. said that she could not definitively identify Plaintiff as her assailant but would like to see him in person. (Id.)  The defendant officers told L.C. that she needed to sign the back of Plaintiff's photo in order for them to pick him up and bring him to her in person.  L.C. followed the defendant officers' instructions but never identified Plaintiff. (Id.)  After she signed the back of the photograph, the defendant officers indicated to L.C. that she had picked out her assailant and that another victim had already identified Plaintiff. (Id.)

The defendant officers never told the prosecution or defense how they had conducted

---

[4]        Defendants Daniels, Shipes, and Crocker were MDPD detectives at the time.

the display of the photo array to L.C. (TAC ¶ 35.)    Instead, the defendant officers falsely reported that L.C. had made a positive identification of Plaintiff from the photo array.  (Id.)

### 2.    Fabricated evidence

On August 27, 1979, Defendants Shipes and Daniels went to Lila's Restaurant, where Plaintiff worked, to ask him to come to the MDPD station to give fingerprints and have a photograph taken. (TAC ¶ 37.)  Defendants Shipes and Daniels communicated with Plaintiff through his co-workers who then translated into Spanish.  (Id.)

On August 27, 1979, Plaintiff voluntarily went to the MDPD station where he gave fingerprints and had his photograph taken.  (TAC ¶ 38.)  The next day, he returned to the MDPD station to be interviewed.  (TAC ¶ 39.)  He was interviewed by Defendants Shipes and Daniels through a Spanish interpreter and his attorney was present throughout the interview.  (Id.)  After this interaction, Defendants Shipes and Daniels fabricated evidence that Plaintiff had spoken English to them at Lila's Restaurant and during his interview. (TAC ¶ 40.)  They also fabricated evidence that Plaintiff's civil attorney had told them that Plaintiff spoke good English and that he had been present during the interview when Plaintiff spoke English.  (TAC ¶ 41.)  On August 29, 1979, Defendants Shipes and Daniels swore out a felony complaint including this deliberately fabricated evidence.  (TAC ¶ 42.)

On August 28, 1979, at the direction of Defendant Keller, Defendants Mendez and Patmore, detectives with the MDPD, went to Plaintiff's old apartment building to canvass his former neighbors.  (TAC ¶ 44.)  Most of the occupants of the apartment building spoke

Spanish. (TAC ¶ 45.)   Defendant Mendez was fluent in Spanish while Defendant Patmore did not speak Spanish.  (Id.)  The same day of the canvass, Defendants Mendez and Patmore told Defendant Keller and the other investigating officers that three of Plaintiff's former neighbors had told them the following information: Plaintiff spoke English; Plaintiff had a mustache in 1977 or 1978; Plaintiff had access to many different cars through his brother-in-law, a used car salesman; Plaintiff often stayed out late at night after work drinking, and often had strange visitors late at night who drove expensive cars; Plaintiff was involved with drugs or associated himself with drug dealers; and the neighbors feared Plaintiff.  (TAC ¶ 46.)  Each of these pieces of information was a deliberate fabrication as none of Plaintiff's neighbors told Defendants Mendez and Patmore any of this information and the information was entirely false.   (TAC ¶ 47.)   Defendant Mendez later created a written report memorializing the fabricated evidence that he claimed he had received from his canvass of Plaintiff's old apartment building.  (TAC ¶ 48.)

The prosecutor authorized the arrest of Plaintiff after receiving the evidence fabricated by Defendants Shipes, Daniels, Mendez and Patmore and the faulty identification of Plaintiff by L.C. (TAC ¶ 49.)  MDPD officers including Defendants Keller, Shipes, Daniels, and Mendez arrested Plaintiff in the early morning of August 29, 1979.  (TAC ¶ 50.) There was absolutely no physical evidence linking Plaintiff to any of the rapes or assaults, despite exhaustive searches by the MDPD.  (TAC ¶ 54.)  There was also no evidence that Plaintiff ever had a gun or access to multiple cars.  (Id.)

At the time, Plaintiff spoke little or no English and this was known to the police defendants.  (TAC ¶ 51.)  Defendant Mendez later falsely reported, both orally and in writing, that, following Plaintiff's arrest, he had an extensive conversation with Plaintiff in English in which Plaintiff understood all questions asked in English and responded appropriately in English.  (TAC ¶ 52.)   Defendant Keller later falsely testified at his deposition that he overheard Plaintiff speaking broken English during this interview with Mendez.  (TAC ¶ 52.)  Defendant Keller also signed off on Defendant Mendez's report of his conversation with Plaintiff and verified it as accurate.  (Id.)

### 3.     The press conference

The same day that Plaintiff was arrested, the MDPD held a press conference announcing the arrest.  (TAC ¶ 55.)  Defendant Heller, the head of the Robbery and Sexual Battery Section of the MDPD, spoke at the press conference, as did Defendant Calvert  (Id.)  At the time of the arrest, MDPD officers, including Defendants Heller and Calvert, knew that almost every victim of the Bird Road Rapist had never identified Plaintiff as their assailant.  (Id.)  They also knew that the MDPD planned on holding a lineup on August 31, 1979 to give the numerous suspected victims of the Bird Road Rapist an opportunity to identify Plaintiff.  (Id.)  Further, they knew that they were not supposed to release any photographs of Plaintiff in advance of the lineup to avoid tainting the lineup.  (Id.)

At the press conference, which was televised, Defendant Heller announced Plaintiff's arrest and stated that, "without hesitation," Plaintiff was involved with at least two of the

rapes. (TAC ¶ 56.) Defendant Heller also gave a physical description of Plaintiff, providing his height, approximate build, and age, knowing that such information could improperly taint the lineup. (TAC ¶ 57.) Additionally, he provided Plaintiff's full name and his home and work address. (Id.) He also falsely indicated that two independent leads had led the police to Plaintiff and that, although Plaintiff denied speaking English, he would break into English during heated exchanges. (Id.) When Defendant Calvert spoke, he falsely stated that he had "long ago" compiled a profile of the Bird Road rapist and that Plaintiff perfectly matched the profile. (TAC ¶ 58.) The press conference was covered by the local newspapers and television news. (Id.)

### 4. The lineup

On August 31, 1979, MDPD officers - including Defendants Shipes, Daniels, Mendez, and Calvert - held a physical lineup containing six people for 22 victims of the Bird Road Rapist. (TAC ¶ 59.) Plaintiff was the only person in the lineup whose photo had been shown to any of the victims prior to the physical lineup. (TAC ¶ 60.) He was also the oldest person in the physical lineup by seven years. (Id.)

Many of the victims were prompted to select someone from the lineup when they initially could not make an identification. (TAC ¶ 62.) Many of the victims expressed uncertainty regarding their selections. (Id.) Only five of the 22 victims identified Plaintiff as their assailant. (Id.) C.J. identified Plaintiff as her assailant. (Id.) But L.C., whose improper photo identification of Plaintiff led to his arrest, did not identify Plaintiff as her

assailant.  (Id.)  A number of the victims picked out other members of the lineup.  (Id.)

Seven victims did not identify anyone in the lineup as their assailant.  (Id.)

Victims who identified Plaintiff as their assailant immediately received positive

reinforcement from the police defendants that they had picked the correct person.  (TAC ¶

63.)  The police did not take statements from victims who picked a person other than Plaintiff

out of the lineup or picked no one; the police conducted no further investigation of their

cases.  (TAC ¶ 64.)  One such woman was told by police that she "misidentified the

defendant."  (Id.)  Two of the victims who did not identify Plaintiff at the line-up, C.L. and

L.C., were privately and repeatedly shown a videotape of the lineup by MDPD officers,

including Defendant Keller, until they identified Plaintiff as their assailant.[5]  (TAC ¶ 65.)

### D.    Plaintiff's prosecution

Plaintiff was prosecuted in eight of the "Bird Road Rapist" cases:  these included the

four women who identified Plaintiff at the live lineup, one woman who tentatively identified

him at the live lineup, the two women who had been induced to identify Plaintiff at the

videotaped playback of the lineup, and one woman who had never reported the alleged

assault against her until she saw Plaintiff's photograph on television during a report on the

Bird Road Rapist.  (TAC ¶ 68.)

The prosecution's case against Plaintiff rested on two pieces of evidence:  the

---

[5]    All of the allegations regarding the August 31, 1979 lineup appear to be directed towards Defendants Shipes, Daniels, Mendez, and Calvert, besides the private videotape viewing of the lineup which appears to be directed solely towards Defendant Keller.

identification of him by the eight victims and the evidence fabricated by various police defendants that Plaintiff spoke English.  (TAC ¶ 69.)  There was no physical evidence linking him to the crime, no evidence that he had access to a gun, and no evidence explaining how he would have gotten access to the cars used by the Bird Road Rapist.  (Id.)  Additionally, fourteen of the victims never identified Plaintiff as their assailant despite the police theory that one person committed all of the attacks.  (Id.)

<b>E.      Plaintiff's civil action</b>

Plaintiff instituted the instant action on April 4, 2007.  (See D.E. 1.)  In his Third Amended Complaint, Plaintiff asserts eleven claims. (See D.E. 191.)  Seven of his claims are against the police defendants: a 42 U.S.C. § 1983 claim for unduly suggestive identification procedures (Count I); a 42 U.S.C. § 1983 claim for false imprisonment and malicious prosecution in violation of the Fourth Amendment (Count II); a 42 U.S.C. § 1983 claim for fabrication of evidence in violation of the Fourteenth Amendment (Count III); a 42 U.S.C. § 1983 claim for deliberate suppression of materially favorable evidence and deliberate failure to conduct an adequate investigation in violation of the Fourteenth Amendment (Count IV); a 42 U.S.C. § 1983 claim for conspiracy to deprive Plaintiff of his civil rights (Count V); and two state law claims for malicious prosecution (Count X) and intentional/reckless infliction of emotional distress (Count XI.)  Three of his claims are against the County: a 42 U.S.C. § 1983 claim  for unconstitutional municipal policy, custom or practice (Count VII); a 42 U.S.C. § 1983 claim for failure to train and/or supervise police

officer (Count VIII); and a state law claim for negligent training and supervision (Count IX.)
He also asserts a 42 U.S.C. § 1983 claim against Defendants Calvert, Keller, and Heller for
supervisor liability (Count VI.)

### II.    The Report

In his lengthy and detailed Report, Magistrate Judge Turnoff reviewed Plaintiff's
claims as they pertained to each of the Defendants.

As to Count I, Plaintiff's claim regarding unconstitutionally suggestive identification
procedures, Magistrate Judge Turnoff found that Plaintiff had adequately stated a claim for
violation of his Fourteenth Amendment right to a fair trial and due process.  Then, addressing
the police defendants' claims to qualified immunity from Count I, Magistrate Judge Turnoff
found that qualified immunity did not attach to Defendants Calvert and Daniels and Shipes
or Crocker for their conduct in connection with the photo array shown to L.C., nor did it
attach to Defendants Calvert, Shipes, and Daniels for their conduct in connection with the
physical lineup.  However, Magistrate Judge Turnoff found that qualified immunity did
shield Defendants Heller and Calvert from liability for their conduct regarding the press
conference and recommended that Count I be dismissed against them. Further, Magistrate
Judge Turnoff found that Plaintiff failed to state a claim as to Defendant Patmore in Count
I.  Magistrate Judge Turnoff also rejected the police defendants' argument that Counts I
through IV were redundant.

As to Count II, Plaintiff's claim for malicious prosecution, Magistrate Judge Turnoff

found that, based on Plaintiff's allegations regarding fabrication of evidence by Defendants Patmore, Shipes, Danies, and Keller, and Defendants Calvert, Daniels, Shipes, Crocker, and Keller's alleged conduct in connection with the photo and physical lineups, Plaintiff had adequately stated a claim in Count II, and that qualified immunity did not shield these defendants from liability.  However, consistent with his findings as to Count I, Magistrate Judge Turnoff found that qualified immunity attached to Defendant Heller with regards to Count II and recommended that the claim against him be dismissed.

As to Count III, Plaintiff's claim regarding fabrication of evidence, Magistrate Judge Turnoff found that Plaintiff had adequately pled his claim against Defendants Patmore, Shipes, Daniels, and Keller, but had failed to make any allegations regarding fabrication of evidence by the other police defendants and as such recommended that Count III be dismissed against these defendants.

As to Count IV, Plaintiff's claim for deliberate failure to disclose material exculpatory and impeachment evidence and deliberate failure to conduct an adequate investigation, Magistrate Judge Turnoff found that Plaintiff had adequately pled claims against Defendants Calvert and Daniels and Shipes or Crocker based on their failure to disclose to the prosecutor the suggestive means used to induce L.C.'s identification, and against Defendant Shipes, Danies, Patmore, and Keller for their failure to disclose that they fabricated evidence.  But Magistrate Judge Turnoff found that Plaintiff had failed to adequately plead a claim in Count IV against Defendant Heller and recommended that it be dismissed against him.

As to Count V, Plaintiff's claim for § 1983 conspiracy by the police defendants, Magistrate Judge Turnoff found that Plaintiff had failed to satisfy the heightened pleading standard for such claims, as he failed to allege specific facts regarding the nature of the conspiracy. Accordingly, he recommended that the claim be dismissed as to all the defendants.

As to Count VI, Plaintiff's claim for § 1983 supervisor liability against Defendants Calvert, Keller, and Heller, Magistrate Judge Turnoff recommended that the claim proceed against Defendant Calvert for his personal participation in the photo lineup and against Defendant Keller for his personal participation in the physical lineup and the fabrication of Defendant Mendez's report, but not against Defendant Heller.

As to Count VII, Plaintiff's claim against the County for unconstitutional municipal policy, custom, or practice in violation of § 1983, Magistrate Judge Turnoff recommended that the claim be dismissed without prejudice, as Plaintiff incorrectly alleged that final policymaking authority for the County rested in the Police Chief and Mayor, and failed to allege that the Board of County Commissioners or the County Manager - with whom final policymaking authority actually rested - adopted an unconstitutional policy, custom, or practice.

As to Count VIII, Plaintiff's claim against the County for failure to train/supervise its police officers in violation of § 1983, Magistrate Judge Turnoff recommended that the claim be dismissed. He found that Plaintiff had failed to establish an officially promulgated County

policy or an unofficial custom or practice of the County shown through repeated acts of a final policymaker.

As to Count IX, Plaintiff's state law claim against the County for negligent training and supervision of its police officers, Magistrate Judge Turnoff found that the training and supervision of police officers was an "operational" function of government and therefore Plaintiff's claim was barred by sovereign immunity. Further, to the extent that Plaintiff alleged negligent training in his Third Amended Complaint, he failed to allege a single fact supporting such a claim. As such, he recommended that the claim be dismissed.

As to Count X, Plaintiff's claim against the police defendants for state law malicious prosecution, Magistrate Judge Turnoff found that the claim could proceed against Defendants Patmore, Shipes, Daniels, Crocker, Calvert and Keller for the same reasons that Plaintiff's § 1983 malicious prosecution claim could proceed, but recommended that the claim be dismissed against Defendant Heller for reason of qualified immunity.

As to Count XI, Plaintiff's claim against the police defendants for intentional infliction of emotional distress, Magistrate Judge Turnoff found that Plaintiff had adequately alleged outrageous conduct against Defendants Shipes, Daniels, Patmore, and Keller to sustain a claim for intentional infliction of emotional distress based on their fabrication of evidence. However, Magistrate Judge Turnoff recommended that the claim be dismissed against Defendants Crocker, Calvert, and Heller, as their alleged conduct did not rise to the necessary level of outrageousness.

16

### III.    Objections

Between Plaintiff and Defendants, the parties object to nearly every recommendation of the Report.

Plaintiff objects to the following from the Report: (1) the recommendation that Count V, Plaintiff's claim for § 1983 conspiracy by the police defendants, be dismissed; (2) the recommendation that Plaintiff's claims in Counts I, II, III, IV, and VI against Defendant Heller be dismissed on grounds of qualified immunity; (3) the recommendation that Plaintiff's claims in Count VII and VIII, Plaintiff's § 1983 claims against the County for unconstitutional municipal policy, custom, or practice, and failure to train/supervise,  be dismissed without prejudice; (4) the recommendation that Plaintiff's claim in Count IX, Plaintiff's state law claim against the County for negligent training and supervision of its police officers, be dismissed without prejudice; (5) the recommendation that Plaintiff's claim in Count X for state law malicious prosecution against Defendant Heller be dismissed; and (6) the recommendation that Plaintiff's claims in Count XI for intentional infliction of emotional distress against Defendants Crocker, Calvert, and Heller be dismissed.

Defendants - collectively, individually, and in groups - make the following objections: (1) Defendants Keller and Calvert object to the recommendation that their motions to dismiss Count VI, Plaintiff's claim for § 1983 supervisor liability, be denied; (2) Defendants Crocker, Patmore, Shipes, Keller, Calvert, and Daniels object to the Report's finding that they are not entitled to qualified immunity based on the fellow officer rule; (3) Defendants Crocker,

Patmore, Shipes, Keller, Calvert, and Daniels object to the Report because it does not adhere to the rule established by the Supreme Court in <u>Devenpeck v. Alford</u>, 543 U.S. 146, 153 (2004), that qualified immunity should apply as long as there is any basis to seize and detain a criminal defendant; (4) Defendants Calvert, Daniels, Shipes, and Crocker object to the Report's recommendation that their motion to dismiss Count I, Plaintiff's claim regarding unconstitutionally suggestive identification procedures, be denied; (5) Defendants Crocker, Patmore, Shipes, Keller, Calvert, and Daniels object to Report's rejection of their argument that Counts I, III, and IV are redundant and should be dismissed; (6) Defendants Crocker, Patmore, Shipes, Keller, Calvert, and Daniels object to the recommendation that their motion to dismiss Counts X and XI, Plaintiff's state law claims for malicious prosecution and intentional infliction of emotional distress, be denied; (7) Defendant Daniels objects to the recommendation that the claims against him proceed even though he was not timely or properly served with process under Rules 4(m), 12(b)(2), 12(b)(4), and 12(b)(5); and (8) Defendants object to the statement at the end of the Report that "[f]ailure to file timely objections shall bar the parties from attacking on appeal the factual findings contained herein," to the extent that the statement means that the Report made any factual findings.

## IV.   Discussion

The Court will address Plaintiff's and Defendants' objections in turn.

### A.   Plaintiff's Objections

#### 1.   Count V of the Third Amended Complaint does not satisfy the heightened pleading standard for conspiracy claims.

To satisfy the heightened pleading standard for conspiracy claims, "'[t]he plaintiff does not have to produce a smoking gun to establish the understanding or willful participation required to show a conspiracy, but must show some evidence of agreement between the defendants.'" Albra v. City of Fort Lauderdale, 232 Fed. Appx. 885, 890-91 (11th Cir. 2007) (quoting Rowe v. City of Fort Lauderdale, 279 F.3d 1271, 1283-84 (11th Cir. 2002)). However, Plaintiff's conclusory allegation that the police defendants "agreed among themselves and with other individuals to act in concert in order to deprive [Plaintiff] of his clearly established Fourth and Fourteenth Amendment rights," (see TAC ¶ 110), is simply insufficient to satisfy Plaintiff's burden. See Fullman v. Graddick, 739 F.2d 553, 557 (11th Cir. 1984) ("A complaint may justifiably be dismissed because of the conclusory, vague and general nature of the allegations of conspiracy.").

Plaintiff contends that, because the Report found that Plaintiff had adequately plead multiple instances of unconstitutional behavior by the police defendants, this alleged behavior, considered collectively, provides circumstantial evidence sufficient to satisfy the heightened pleading standard for conspiracy claims. Plaintiff's argument fails in light of the Supreme Court's recent decision in Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955 (2007). In Twombly, the Supreme Court focused on the allegations necessary to state a claim for a Sherman Act conspiracy. See Twombly, 127 S. Ct. at 1964. The plaintiff in Twombly filed an antitrust class action complaint broadly alleging a conspiracy to fix telephone service charges based largely upon allegations of parallel business conduct coupled with "merely

19

legal conclusions" about an alleged conspiratorial agreement.  Focusing on the requirement that a plaintiff properly plead an illegal agreement, the Court held that the pleading of nothing more than parallel conduct among defendants is insufficient to state a claim for conspiracy. Twombly, 127 S. Ct. at 1964. Thus, the Court stated that "parallel conduct" standing alone, "fails to bespeak agreement." Id. Similarly, Plaintiff's allegations of parallel constitutional violations standing alone, fail to bespeak agreement between the police defendants..

Plaintiff further argues that, because he has not had the opportunity to engage in discovery, it would be unfair to dismiss his conspiracy claim when all such evidence supporting his claim is in the hands of the Defendants. Were the Court to accept this argument, it would be tantamount to an evisceration of the heightened pleading standard for § 1983 conspiracy claims, because every plaintiff could simply claim that the elusive evidence of an agreement in support of a conspiracy was in the hands of the defendants, thereby avoiding his burden to plead particularized allegations.  Accordingly, Plaintiff's conspiracy claim in Count V is dismissed without prejudice.

> **2. Plaintiff has failed to establish that Defendant Heller's conduct violated Plaintiff's clearly established constitutional rights and therefore he is entitled to qualified immunity.**

Plaintiff also objects to the Report's recommendation that Defendant Heller is entitled to qualified immunity for his actions relating to the press conference.  "Qualified immunity offers a complete protection for government officials sued in their individual capacities if

their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" <u>Vinyard v. Wilson</u>, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)).

Magistrate Judge Turnoff found that Defendant Heller's actions in regards to the press conference did not violate any "clearly established" right of the Plaintiff.  Plaintiff concedes that he has been unable to find any pre-1979 (or post-1979) caselaw specifically addressing Defendant Heller's conduct, but argues that the law was sufficiently developed to put him on notice that his conduct was violative of Plaintiff's clearly established rights.  The Court disagrees.  While the Supreme Court had held prior to the events in question that the risk of impermissible identification is greatly heightened if the victim is shown pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized, <u>see</u> <u>Simmons v. United States</u>, 390 U.S. 377, 383 (1968), and condemned identification procedures in which "[i]n effect, the police repeatedly said to the witness, '<u>This is the man</u>,'" <u>Foster v. California</u>, 394 U.S. 440, 442-43 (1969) (emphasis supplied), extending these holdings to Defendant Heller's actions would stretch these holdings far beyond the fair notice required by the law.  <u>See</u> <u>Bashir v. Rockdale County</u>, 445 F.3d 1323, 1331 (11th Cir. 2006) ("This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent.") (internal citations and quotations omitted)).  That is, based on the holdings of <u>Simmons</u> and <u>Foster</u>,

it would not be apparent to Defendant Heller that he was violating a clearly established constitutional right by announcing in a press conference, two days prior to the physical lineup, that a suspect had been caught and providing his age, height, and approximate build (see TAC ¶ 57).

Plaintiff also argues in his Objections that even if Defendant Heller was not independently liable he could still be subject to supervisory liability.  The Court rejects this argument as well.  "Supervisor liability [under § 1983] occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation."  Brown v. Crawford, 906 F.2d 667, 671 (11th Cir.1990).  A causal connection can be established in three ways: "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so," id.; "when the supervisor's improper custom or policy . . . resulted in deliberate indifference to constitutional rights," Rivas v. Freeman, 940 F.2d 1491, 1495 (11th Cir. 1991); or "by facts which support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so," Gonzalez v. Reno, 325 F.3d 1228, 1235 (11th Cir. 2003).   Plaintiff has failed to allege personal participation in any of the alleged constitutional violations outlined in the Third Amended Complaint, nor has he alleged specific facts demonstrating a causal connection between Defendant Heller's statements at the press conference and the alleged constitutional

22

violations by the other police defendants.  As such, the § 1983 claims against Defendant Heller must be dismissed.

### 3. Plaintiff's claims against the County in Counts VII and VIII are properly dismissed without prejudice.

Plaintiff also objects to the Report's recommendation that his claims against the County in Counts VII and VIII be dismissed without prejudice. Plaintiff argues the Report erred in recommending that Count VII - Plaintiff's § 1983 claim for unconstitutional municipal policy, custom or practice promulgated by the County's final policymakers - be dismissed without prejudice, because the identity of final policymakers is a fact specific inquiry. He further argues that the Third Amended Complaint adequately alleged a custom and practice by the County of failing to train and supervise its police officers, and therefore his claim in Count VIII - his § 1983 claim for failure to train and/or supervise police officer - should be allowed to proceed.  The Court disagrees with both arguments.

### a. Count VII

Regarding Count VII, to establish "liability under the final policymaker theory of municipal liability, 'the challenged action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy in that area of the city's business.'" Gomez v. Metro Dade County, Florida, 801 F. Supp. 674, 677 (S.D. Fla. 1992) (quoting City of St. Louis v. Praprotnik, 485 U.S. 112, 123 (1988)). Determining whether a County employee has final policymaking authority is a question of law for the judge to decide.  Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737 (1989) (quoting

23

Praprotnik, 485 U.S. at 124 n.1).  The trial judge "must identify those officials or governmental bodies who speak with final policymaking authority for the local government actor concerning the action alleged to have caused the particular constitutional statutory violation at issue." Gomez, 801 F. Supp. at 677 (quoting Jett, 491 U.S. at 736).

In Wilson v. Miami-Dade County, 2005 WL 3597737 (S.D. Fla. Sept. 19, 2005), another court in this district dismissed a plaintiff's § 1983 claim against the County on grounds that the plaintiff failed to allege facts that could support § 1983 liability. The plaintiff in Wilson alleged that the County - through the Police Department Director, acting as the County's alleged final policymaker - was deliberately indifferent to the plaintiff's constitutional right to be protected from being murdered by a Miami-Dade police officer. Id. at *4. The Wilson court recognized that the courts in this district have "on multiple occasions recognized that the final policymaking authority for Miami-Dade County rests solely with the Board of County Commissioners or the County Manager." Id. at *8.[6]  The Wilson court further found that, for purposes of § 1983 liability, the Director of the Police Department was not the final policymaker for Miami-Dade County, as "[p]olicymaking authority is not conferred by the mere delegation of authority to a subordinate to exercise

_____

[6]      A number of courts in this district have found the same thing.  See also Moore v. Miami-Dade County, 502 F. Supp. 2d 1224, 1230 n.4 (S.D. Fla.  2007) (Gold, J.) ("The final policy making authority for Miami-Dade County rests solely with the Board of County Commissioners or the County Manager.") (citations omitted); Buzzi v. Gomez, 62 F. Supp. 2d 1344, 1359-60 (S.D. Fla. 1999) (Gold, J.) (finding that Carlos Alvarez, as head of the Police Department, was not the final policymaker for the County); Lawrence v. Metro. Dade County, 872 F. Supp. 957, 964 (S.D. Fla. 1994) (Ungaro, J.) (noting that the County Manager oversees the police department).

discretion."  Id. (citations omitted). Where the Director's decisions "were limited by the ordinances, resolutions, rules, and regulations passed by the Board and those officials delegated by the Board to promulgate administrative orders," and the Director's actions "were not unrestricted and were subject to review by the Board or other sources which instituted policy having the force of law, his decisions were not 'final,'" and the County could not be held liable under § 1983.  Id.  Thus, the Wilson court dismissed the § 1983 claim against the County despite the plaintiff's allegation that the Police Department Director was the County's final policymaker.  Id. at *9.

Plaintiff alleges in his Third Amended Complaint that at all times relevant to this action, "the final policymakers for the MDPD included, without limitation, the Police Chief and the Mayor of the County."[7] (TAC ¶ 20.)  As noted by other courts in this district, such as the court in Wilson, and as provided for in the County's Charter as it existed in 1979, these allegations are incorrect and fail to correctly identify the final policy makers for the County. The County's Charter, as it existed in 1979, stated that: the "Board of County Commissioners shall be the legislative and the governing body of the county and shall have the power to carry on a central metropolitan government" (Miami-Dade County Home Rule Charter § 1.01(A));  the County Manager "shall be the chief executive officer and head of the administrative branch of the county government" (id. § 3.01); and the Manager's

---

[7]     The Court notes that Plaintiff's allegations are further inadequate because they identify the final policymakers for the MDPD when they should be identifying the final policymakers for the County, the defendant that is the subject of his claim.

responsibilities included "the administration of all units of the county government under his jurisdiction, and for carrying out policies adopted by the Commission" (id. § 3.04(A)).

Thus, as presently plead, Plaintiff fails to state a claim for unconstitutional municipal policy, custom or practice, because he attributes final policymaking authority to the Police Chief and the Mayor of the County.  That is, Plaintiff has not carried his burden of making a "plausible claim" that the challenged action was taken pursuant to a policy adopted by the official or officials responsible under state law for making policy in that area of the County's business, because he fails to even identify the correct policy maker.  See Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) ("Determining whether a complaint states a plausible claim is context-specific, requiring the reviewing court to draw on its experience and common sense.").

### b.    Count VIII

Regarding Court VIII, a county is liable for a failure to train or supervise only when the county's "official policy" causes a constitutional violation.  Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978).  A plaintiff has two methods by which to establish a county's policy: identify either (1) an officially promulgated county policy or (2) an unofficial custom or practice of the county shown through the repeated acts of a final policymaker for the county.  Grech v. Clayton County, 335 F.3d 1326, 1329 (11th Cir. 2003) (citing Monell, 436 U.S. at 690-91, 694; Brown v. Neumann, 188 F.3d 1289, 1290 (11th Cir. 1999)).  "A custom or practice, while not adopted as an official formal policy, may be so

pervasive as to be the functional equivalent of a formal policy." Id. at 1330 n.6.  However, a single incident would not be so pervasive as to be a custom or practice.  Id.

Plaintiff argues that he has provided "abundant specific factual allegations about the misconduct in this case, as well as direct allegations that this misconduct was part of a general custom and practice of unconstitutional behavior."  However, the Court finds that he has not shown that the constitutional violations alleged in his Third Amended Complaint are so pervasive as to be the functional equivalent of a formal policy.  Besides the specific actions of the police defendants alleged in the Third Amended Complaint, Plaintiff has alleged no additional facts demonstrating that the events in question here were part of a custom or practice.  Magistrate Judge Turnoff put it well in the Report: "At best, and read in the light most favorable to Plaintiff, the Third Amended Complaint alleges that the County chose to ignore unconstitutional conduct by its police officers in this instance.  This is insufficient to state a § 1983 claim for failure to train."  (Report at 29.)  See also Depew v. St. Mary's, 787 F.2d 1496, 1499 (11th Cir. 1986) ("random acts or isolated incidents are insufficient to establish a custom or policy.").

### 4.   Count IX of the Third Amended Complaint fails to state a claim.

Plaintiff objects to the Report's finding that the County could not be held liable for Plaintiff's state law negligent training and supervision claim in Count IX.  Magistrate Judge Turnoff found that, because a municipality's decisions regarding how to train its officers and what subject matter to include in the training are clearly an exercise of governmental

discretion concerning fundamental questions of policy and planning, the County is entitled to sovereign immunity.  (See Report at 31 (citing Lewis v. City of St. Petersburg, 260 F.3d 1260, 1266 (11th Cir. 2001)).)

In his Objections, Plaintiff fails to even present an argument that the County's training and supervision of its police officers was an operational, as opposed to discretionary, function.  Instead, Plaintiff recites the conclusory allegations from his Third Amended Complaint that the County had a duty to ensure proper training and supervision of the police officers and breached that duty (TAC ¶¶ 131, 132), causing the police officers to commit the various alleged constitutional violations detailed therin (TAC ¶ 133).  To the extent that Plaintiff is arguing that the County can be liable for the manner in which it implemented its discretionary supervision and training programs, Plaintiff's bald allegations fail to satisfy basic notice pleading standards.  See Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) ("[T]he tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements.").

> **5.     It is irrelevant whether Defendant Heller is entitled to qualified immunity for Plaintiff's claim for malicious prosecution in Count X, because Plaintiff has failed to state a claim against him.**

In his fifth objection, Plaintiff argues that the Report erred in dismissing his state law claim for malicious prosecution against Defendant Heller based on his qualified immunity.

Plaintiff's objection fails because, even if Defendant Heller was not entitled to qualified immunity, Plaintiff has failed to state a claim against him for malicious prosecution.

28

Under Florida law, a plaintiff must establish each of six elements to support a claim of malicious prosecution: (1) an original judicial proceeding against the present plaintiff was commenced or continued; (2) the present defendant was the legal cause of the original proceeding; (3) the termination of the original proceeding constituted a bona fide termination of that proceeding in favor of the present plaintiff; (4) there was an absence of probable cause for the original proceeding; (5) there was malice on the part of the present defendant; and (6) the plaintiff suffered damages as a result of the original proceeding. See Kingsland v. City of Miami, 382 F.3d 1220, 1234 (11th Cir. 2004) (citing Durkin v. Davis, 814 So. 2d 1246, 1248 (Fla. 2d DCA 2002)).

Besides his allegations regarding Defendant Heller's conduct during the press conference, Plaintiff has failed to make any specific allegations that Defendant Heller ever spoke to the prosecutor or to a jury or was involved in any of the evidence presented at trial. Further, the Third Amended Complaint does not contain any specific facts or otherwise explain how Defendant Heller had anything to do with the arrest or prosecution of Plaintiff. Plaintiff's conclusory allegations contained in his counts for relief that Defendant Heller was involved in the other police defendants' alleged unconstitutional actions are insufficient to state a claim.  See Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009).

### 6. The intentional infliction of emotional distress claim may proceed against Defendants Crocker and Calvert.

Plaintiff objects to the Report's recommendation that his claims for intentional infliction of emotional distress be dismissed against Defendants Crocker, Calvert, and Heller.

29

To establish a cause of action for intentional infliction of emotional distress, four elements must be proven: (1) deliberate or reckless infliction of mental suffering; (2) outrageous conduct; (3) the conduct must have caused the emotional distress; and (4) the distress must be severe.  Dependable Life Ins. Co. v. Harris, 510 So. 2d 985, 986 (Fla. 5th DCA 1987).  Conduct is considered outrageous when it is found "to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" Smith v. Telophase Nat'l Cremation Soc., 471 So. 2d 163, 166 (Fla. 2d DCA 1985) (quoting Restatement (Second) of Torts § 46 at 73 (1965)).

The Court agrees with Plaintiff that he has made a valid claim for intentional infliction of emotional distress against Defendants Crocker and Calvert.  Their alleged behavior during the photo array shown to L.C. and their failure to inform the prosecutor or the defense of the circumstances surrounding her supposed identification of Plaintiff's photograph, which, according to the Third Amended Complaint, led to Plaintiff false imprisonment for over twenty years, are sufficiently intolerable to make the average person exclaim, "Outrageous!"

However, the Court concurs with the Report's recommendation that the intentional infliction of emotional distress claim be dismissed against Defendant Heller.  The Court finds that his actions during the press conference, in which he announced Plaintiff's arrest and stated that he was the Bird Road Rapist, are not sufficiently outrageous to sustain Plaintiff's

claim in Count XI, particularly because Plaintiff has failed to allege that Defendant Heller's conduct had anything to do with Plaintiff's arrest and prosecution.

### B.     Defendants' Objections

#### 1.     Iqbal does not bar Plaintiff's supervisory liability claims in Count VI.

Defendants Calvert and Keller argue that Count VI, Plaintiff's claim for supervisory liability, must be dismissed pursuant to the Supreme Court's recent decision in Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009).  In Iqbal, the Supreme Court rejected the argument that a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution, holding that:

> Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct. In the context of determining whether there is a violation of clearly established right to overcome qualified immunity, purpose rather than knowledge is required to impose Bivens liability on the subordinate for unconstitutional discrimination; the same holds true for an official charged with violations arising from his or her superintendent responsibilities.

129 S. Ct. at 1949.

Defendants Calvert and Keller argue that Iqbal eliminates "supervisory liability" claims, thereby foreclosing Plaintiff's claim in Count VI. Defendants Calvert and Keller further contend that they are not being sued for any action taken as a supervisor (such as an order or instruction to the line officers), but, instead, are being sued for their own personal conduct as police officers. As they are already been sued in Counts I-IV for this alleged conduct, their argument continues, Plaintiff should not be permitted to maintain a redundant

count for supervisory liability, when he is not suing Defendants Calvert and Keller for any supervisory actions, and when such a count is no longer recognized by the Supreme Court.

The Court rejects Defendants Calvert and Keller's reading of Iqbal as overbroad. The above-quoted passage from Iqbal stands for the proposition that a supervisor cannot be vicariously liable solely for the acts of a subordinate. However, there is no indication that the Supreme Court intended to wipe out the well-developed body of law surrounding supervisory liability, and Eleventh Circuit decisions post-Iqbal have given no indication that § 1983 supervisory liability claims are now barred. See Gross v. White, 2009 U.S. App. Lexis 15939 (11th Cir. July 17, 2009) (citing Iqbal and, in another part of the opinion, summarizing Eleventh Circuit case law on supervisory liability claims).

Additionally, regarding Defendants' argument that Plaintiff's supervisory liability claim against Defendants Calvert and Keller is redundant because it realleges conduct that they are already being sued for in Counts I through IV, this argument fails because Plaintiff is "the master of the complaint," Holmes Group, Inc. v. Vornado Air Circulation Sys., 535 U.S. 826, 831 (2002), and therefore he has the right to assert multiple and alternative theories of liability and have each considered on its own merits.

### 2. Defendants Crocker, Patmore, Shipes, Keller, Calvert and Daniels are not entitled to qualified immunity.

Defendants Crocker, Patmore, Shipes, Keller, Calvert and Daniels object to the Report's recommendation that they are not entitled to qualified immunity. Defendants do not point to any of the Report's findings as to specific counts, but instead argue generally that

32

the "fellow officer" rule, the identification by other witnesses, and the existence of arguable probable cause mandate their wholesale dismissal from this action.  These arguments fail.

### a.    The fellow officer rule

The "fellow officer rule" allows an arresting officer to assume probable cause to arrest a suspect from information supplied by other officers. See Voorhees v. State, 699 So. 2d 602, 609 (Fla. 1997).  In their Objections, Defendants appear to argue that after Defendant Mendez told the other police defendants that he had spoken with Plaintiff's neighbors and received suspicious information from them, they were thereafter permitted to rely on this information in arresting Plaintiff.

While Defendants fail to identify any specific claim that they wish to be immunized from pursuant to the fellow officer rule, the Court declines to afford them qualified immunity against Plaintiff's claims stemming from the unduly suggestive lineups (Count I), the fabrication of evidence (Count III), and the Brady violations (Count IV) based on the mere fact that they may have received some information from another officer.

Defendants also appear to argue that, even if the fellow officer rule does not shield them from liability for Counts I, III, and IV, they are nonetheless shielded from Plaintiff's claim for malicious prosecution and false imprisonment (Count IV) based on Defendant Mendez's report regarding Plaintiff's neighbors' statements.  Even if this argument has merit, the Court concurs with the finding of the Report that applying the fellow officer rule is premature at this stage. There are unresolved factual questions regarding what each of the

33

Defendants knew, what information had been supplied to them by their fellow officers, and whether they knew such information was false, when they commenced or continued the legal proceedings against Plaintiff.  Defendants contend that this recommendation is in error because the fellow officer rule is part of the qualified immunity analysis and qualified immunity should be resolved as early in the litigation as possible.  (See Defendants' Objections, D.E. 231 at 6 (citing Scott v. Harris, 127 S. Ct. 1769, 1774 n.2 (2008).)  The Court concurs that qualified immunity should be resolved at the earliest possible stage in the litigation, but finds that, as recommended by the Report, the current stage is too soon.

### b.   Identification by other witnesses and arguable probable cause

Defendants also argue in their Objections that, in determining whether probable cause existed to arrest Plaintiff, they were entitled to rely on C.J.'s initial identification of Plaintiff as her assailant, the other victims' later identification of Plaintiff as their assailant at a lineup, and Defendant Mendez's report.  Without addressing the factual question of whether C.J.'s identification of Plaintiff - which the MDPD had earlier found unreliable - the other victims' identifications - which were allegedly based on unconstitutionally suggestive lineup procedures - or Defendant Mendez's report - which, as noted above, is factually undeveloped because the Court does not know when the report was disseminated and who knew about it - were enough for probable cause, the Third Amended Complaint alleges that the prosecutor authorized the arrest of Plaintiff after receiving the evidence fabricated by Defendants Shipes, Daniels, Mendez and Patmore and the faulty identification of Plaintiff by L.C. (TAC

¶ 49).  Therefore, there is a factual question, based on the allegations of the Third Amended Complaint, whether C.J.'s and the other victims' testimony and Defendant Mendez's report were used by the police defendants to establish probable cause, as the police defendants argue they were.  Further, while, as noted above, Defendants do not specify for which claims they want to be immunized, the mere fact that they had some probable cause for arresting Plaintiff could not immunize them for their alleged violations of Plaintiff's constitutional rights in Counts I, III, and IV.

### 3.    Defendants misapply <u>Davenpeck</u>.

Defendants argue in their Objections that the Report is erroneous as its fails to recommend that Defendants are entitled to qualified immunity under the rule in <u>Davenpeck v. Alford</u>, 543 U.S. 146, 153 (2004).  Defendants contend that, under the rule announced in <u>Davenpeck</u>, qualified immunity applies as long as there was some objectively lawful basis for police action.  Therefore, Defendants argue, because there was some valid evidence suggesting probable cause for Plaintiff's arrest, Defendants are entitled to qualified immunity.

This is a misreading of <u>Davenpeck</u>, which dealt with the question of whether an arrest is lawful under the Fourth Amendment when the criminal offense for which there is probable cause to arrest is not "closely related" to the offense stated by the arresting officer at the time of arrest.  <u>Id.</u> at 148.  The Supreme Court's holding that probable cause in the context of a Fourth Amendment challenge to an allegedly false arrest "depends upon the reasonable

conclusion to be drawn from the facts known to the arresting officer at the time of the arrest," and that the probable cause inquiry is objective rather than subjective, id. at 152-53, is inapposite to the facts and claims alleged in the Third Amended Complaint - Plaintiff has not even made a claim for false arrest - and will not be addressed any further.

### 4.    Plaintiff's claims in Count I may proceed.

Defendants make two objections to the Report's recommendation that Plaintiff's claim for suggestive identification methods be allowed to proceed.  First, Defendants contend that a claim for the use of an allegedly suggestive identification method is barred by the Supreme Court's decision in Manson v. Brathwaite, 432 U.S. 98, 113 n.13 (1977).  Second, Defendants argue that the recommendation that the lineups themselves violated clearly established law in the late 1970s is incorrect because the cases from that era do not specifically tell a police officer that it would be illegal to prepare a photo array using mug shots of several people and a drivers license photo of Plaintiff or to prepare a physical lineup in which Plaintiff was seven years older than the next-oldest person in the lineup.

The Court rejects both of Defendants' objections.  As to the first objection, the Supreme Court's holding in Manson is not as narrow as Defendants claim.  While the Supreme Court held in that case that "a suggestive preindictment identification procedure does not in itself intrude upon a constitutionally protected interest," 432 U.S. at 113 n.13 (emphasis supplied), Plaintiff does not allege a constitutional violation arising solely from the allegedly impermissibly suggestive identification procedures; instead, he alleges that "as

36

a result of these unduly suggestive procedures, ten victims misidentified [Plaintiff] both before and at trial, in violation of his  Fourteenth Amendment right to a fair trial and not to be deprived of liberty without due process of law."  (<u>See</u> TAC ¶ 80.)  As recognized by Magistrate Judge Turnoff, this is a valid claim in the Eleventh Circuit.  <u>See, e.g.</u>, <u>Cikora v. Dugger</u>, 840 F.2d 893, 895 (11th Cir. 1988).  Defendants completely fail to address this portion of the Report.

Defendant's second objection - regarding whether Defendants' alleged actions during the lineups violated Plaintiff's clearly established constitutional rights - is also without merit.

Regarding the photo lineup, Defendants are incorrect when they claim that they are entitled to qualified immunity because the Supreme Court had not specifically ruled on the exact factual scenario presented in this case at the time the photo lineup occurred  As explained by the Supreme Court, "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. <u>This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent</u>." <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987) (emphasis supplied). In this case, the Report identified two cases that should have made the unlawful nature of their conduct apparent at the time Defendants Calvert and Daniels and Shipes or Crocker conducted the photo lineup: <u>Simmons v. United States</u>, 390 U.S. 377, 383 (1968), in which the Supreme Court held that the risk of impermissible identification is

37

greatly heightened if the victim is shown pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized; and <u>Foster v. California</u>, 394 U.S. 440, 442-43 (1969), in which the Supreme Court condemned identification procedures in which "[i]n effect, the police repeatedly said to the witness, '<u>This is the man.</u>'" (Emphasis supplied.)  By creating a suggestive photo array in which Plaintiff's photo was a driver's license photo while the photos of all the other suspects in the photo array were mug shots, as alleged in the Third Amended Complaint, Defendants should have known based on <u>Simmons</u> and <u>Foster</u> that their conduct was unlawful.

Regarding the physical lineup, at the time of the events in question the Fifth Circuit had held that a significant disparity in the ages of the lineup participants could influence a witness who believed that the culprit was an "older" person.  <u>See Swicegood v. Alabama</u>, 577 F.2d 1322, 1327 (5th Cir. 1978).[8]  "Thus, a lineup with only one 'older' person could impermissibly point the finger at that individual, albeit in a much more subtle fashion than in other situations." <u>Id.</u>  In this case, there was a seven-year gap between Plaintiff and the next oldest person in the lineup.  This gap was particularly significant in the case of C.J.'s identification as she had previously described her assailant as a man with graying hair (<u>see</u> TAC ¶ 25) and thus was particularly susceptible to being influenced by Plaintiff's advanced age compared to the rest of the men in the lineup.  Plaintiff also alleged that after

---

[8]     In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all decisions handed down by the former Fifth Circuit before October 1, 1981.

some of the victims had given tentative identifications of Plaintiff as their assailant, the police defendants immediately gave those witnesses positive reinforcement causing them to cement their identifications.   Additionally, some of the police defendants, including Defendant Keller, singled out victims who had picked someone other than Plaintiff at the lineup and repeatedly showed them videotapes of the lineup until they picked out Plaintiff. All this was improper.  See Foster v. California, 394 U.S. 440, 442-43 (1969) (condemning identification procedures in which "[i]n effect, the police repeatedly said to the witness, 'This is the man.'") (emphasis supplied).

Accordingly, the Court concurs with the recommendation of the Report that the police defendants allegedly involved in the photo lineups are not entitled to qualified immunity for these actions.

**5.     Defendants' "redundancy" objections are without merit**.

In their fifth objection, Defendants rehash their argument that Plaintiff's claim in Count I regarding the unduly suggestive photo lineup is invalid under Manson v. Brathwaite, 432 U.S. 98, 113 n.13 (1977).  The Court has already rejected that argument.

Defendants also contend that Plaintiff's claims in Counts I through IV should be plead under the Fourth Amendment (as in Count II) not the Fourteenth Amendment (as in Count I, III, and IV), or, at most, Plaintiff should be permitted to plead only one Fourth Amendment claim and one Fourteenth Amendment claim.  These arguments are meritless.  The cases cited by Defendants in support of their argument that Counts I through IV should be plead

under the Fourth Amendment stand for the proposition that claims for malicious prosecution must be plead under the Fourth Amendment.  See Wood v. Kesler, 323 F.3d 872, 882 n. 14 (11th Cir. 2003) (noting that the Eleventh Circuit has  recognized the constitutional tort of malicious prosecution under the Fourth Amendment). However, this is exactly what Plaintiff has done, as his claim for malicious prosecution in Count II is plead under the Fourth Amendment.  The remainder of his claims are properly plead under the Fourteenth Amendment: Count I, unduly suggestive identification procedures, see Marsden v. Moore, 847 F.2d 1536, 1545 (11th Cir. 1988) (setting forth elements of due process violation arising from unduly suggestive identification procedures); Count III, fabrication of evidence, see Schneider v. Estelle, 552 F.2d 593, 595 (5th Cir. 1977) (recognizing due process claim for state's fabrication of evidence); and Count IV deliberate suppression of materially favorable evidence, see Brady v. Maryland, 373 U.S. 83 (1963) ("the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.").

To the extent that Defendants contend that Plaintiff should only be allowed to assert one claim each under the Fourth and Fourteenth Amendment, the Court concurs with the finding in the Report that the causes of action contained in Counts I through IV are separate and distinct as they have unique elements and concern different actions by the police defendants.  As stated above, Plaintiff is "the master of the complaint," Holmes Group, Inc.

40

v. Vornado Air Circulation Sys., 535 U.S. 826, 831 (2002), and therefore he has the right to assert multiple and alternative theories of liability and have each considered on its own merits.

> **6.      Defendants' objections regarding Plaintiff's state law claims are also without merit.**

Defendants object to the Report's recommendation that Plaintiff's state law claims for malicious prosecution and intentional infliction of emotional distress be allowed to proceed on the grounds that probable cause existed for Plaintiff's arrest based on the factual allegations of the Third Amended Complaint.  The Court has already rejected this argument.

> **7.      Defendant Daniels is not dismissed from this action for Plaintiff's failure to timely serve him.**

Defendant Daniels objects to Report's failure to address his motion to dismiss for Plaintiff's failure to timely serve him.  (See D.E. 151 at 14-16.)  The Court will now address that argument.

Plaintiff failed to serve Defendant Daniels within 120 days from the filing of his Complaint as required by Federal Rule of Civil Procedure 4(m).  Rule 4(m) also provides that the Court must grant an extension to serve a defendant upon a showing of good cause by the plaintiff.  The Court finds that Plaintiff has demonstrated good cause for failing to serve Defendant Daniels within 120 days from the filing of his Complaint.  Magistrate Judge Torres ordered the U.S. Marshals Service to effect service upon Defendant Daniels using the last-known address of Defendant Daniels provided by Defendant Miami-Dade County.  (See

41

D.E. 156 at 2.)  The Marshals were unable to serve Defendant Daniels on the basis of this information.  (Id. at 3.)  Plaintiff then had to locate Defendant Daniels on his own, a difficult task given Defendant Daniels's common name and the general lack of information regarding his whereabouts.  (Id. at 5.)  Accordingly, the Court finds that Plaintiff has demonstrated good cause and Defendant Daniels is not dismissed from this action for Plaintiff's failure to timely serve him.

> **8.     The Court has not made any factual findings and the parties have not waived their right to contest the factual allegations of the Third Amended Complaint.**

Defendants final objection is to the statement at the end of the Report that "[f]ailure to file timely objections shall bar the parties from attacking on appeal the factual findings contained herein." (D.E. 225 at 33.)  Defendants argue that Report addresses a motion to dismiss, which is based on the allegations in the pleadings, so there should be no "factual findings" at this time.  The Court agrees and finds that Defendants have not waived any rights to contest the factual allegations of the Third Amended Complaint thus far.

**V.     Conclusion**

Accordingly, it is hereby **ORDERED AND ADJUDGED** that:

1.      The Report of Magistrate Judge William C. Turnoff (D.E. 225), issued on

    June 9, 2009, is **ADOPTED IN PART**.[9]

---

[9]      Only two portions of the Report are not adopted herein.  First is the recommendation that the Court dismiss Plaintiff's claim for intentional infliction of emotional distress against Defendants Crocker and Calvert.  As discussed, supra, that claim may proceed against those defendants.  Second is the recommendation that the Court dismiss Plaintiff's

2.      Defendants Shipes's Motion to Dismiss (D.E. 197), Defendant Patmore's Motion to Dismiss (D.E. 196), Defendant Crocker's Motion to Dismiss (D.E. 195), Defendant Calvert's Motion to Dismiss (D.E. 199), Defendant Keller's Motion to Dismiss (D.E. 198) and Defendant Daniels's Second Motion to Dismiss (D.E. 200) are **GRANTED IN PART AND DENIED IN PART** consistent with the Report as adopted by this Order.

3.      Defendant Heller's Motion to Dismiss (D.E. 194) and Defendant Miami-Dade County's Motion to Dismiss (D.E. 193) are **GRANTED** consistent with the Report as adopted by this Order.

4.      Plaintiff must amend his Third Amended Complaint consistent with this Order within 30 days.

**DONE AND ORDERED** in Chambers at Miami, Florida this 10th day of September, 2009.

**JOAN A. LENARD**
**UNITED STATES DISTRICT JUDGE**

---

conspiracy claim in Count V against all Defendants.  As discussed, supra, Count V is dismissed without prejudice such that Plaintiff may replead the claim, provided that he can adduce sufficient facts.

43